IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
vs.                            )    Case No. 2:05-00003
                               )
YOUNG MOON,                    )
                               )
            Defendant.         )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE TODD J. CAMPBELL, CHIEF JUDGE

TRANSCRIPT

OF

PROCEEDINGS

April 24, 2006

Sentencing Hearing

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

        For the Government:  Ms. Ellen Bowden McIntyre
                             Mr. Samuel Williamson
                             Asst. U.S. Attorneys
                             110 Ninth Avenue S., Suite A961
                             Nashville, TN 37203

        For the Defendant:   Ms. Jennifer Thompson
                             Mr. James Simmons
                             Attorneys at Law
                             1208 17th Avenue S.
                             Nashville, TN 37212

PREPARED BY:

                 CATHY B. LEIGH, RDR, CRR
                 Official Court Reporter
                 801 Broadway, Room A839
                 Nashville, TN 37203
                 (615) 726-8697

I N D E X

Page

GOVERNMENT'S PROOF

DR. MACE ROTHENBERG:
    Direct    14
    Cross    17
    Redirect    20
    Recross    21

SHARON MATHENY:
    Direct    24
    Cross    44
    Redirect    51

DIANE DeWITT:
    Direct    52

DONELLE BOWMAN:
    Direct    62

SHIRLEY ROGERS:
    Direct    67

DEFENDANT'S PROOF

SHARON MATHENY:
    Direct    83
    Cross    99

EXHIBITS

    G1    Intended fraud amount summary    30
    G2    List of patients with private other ins.    36
    G3    Applied view of patient    37
    G4    Ranking Taxol patients indictment timeframe    38
    G5    Ranking Camptosar patients "    41
    G6    List of patients for indictment timreframe    43

1    The above-styled cause continued to be heard on

2  April 24, 2006, before the Honorable Todd J. Campbell, Chief

3  Judge, when the following proceedings were had, to-wit:

4    THE COURT:  We are here to take up the case of

5  United States versus Young Moon.  The purpose of the hearing

6  is a sentencing.  There are a few preliminary matters we need

7  to take up.  The first is on Friday, a motion to continue was

8  filed and the government has filed a response in opposition.

9  Ms. Thompson, can you tell me which parts, if any, of the

10  ex parte affidavit that you filed and the attachments thereto

11  were served on the government?

12    MS. THOMPSON:  The affidavit and the attachments

13  were not served on the government, Your Honor.

14    THE COURT:  Is there any objection to serving a

15  copy of the memorandum by Dr. Jackson on the government?

16    MS. THOMPSON:  Well, at this time, Your Honor,

17  Friday night Dr. Moon telephoned me at home and told me that

18  she did not want to proceed with my motion and she did not

19  want to continue the matter.  We have again met about that

20  this morning and she feels very firm in her belief that she

21  does not want to continue this matter.  She does not request

22  a continuance, and she would like for me to strike that

23  motion.  That's against advice of counsel, but I wanted to

24  make it clear on the record.

25    I did call the government or I spoke with the U.S.

1  Attorney earlier today and told her that I thought we would

2  be striking our motion to continue and my request that I

3  filed.

4          THE COURT:  All right.  Well, I will allow you to

5  withdraw the motion, but I think that the government is

6  entitled to see the letter from Dr. Jackson unless you

7  convince me otherwise.  I don't see any attorney-client

8  privilege in there.

9          MS. THOMPSON:  I don't have any strong objection

10 to that.

11         THE COURT:  All right.  Mrs. Bush, would you hand

12 this to counsel.  I want to make sure that the government is

13 aware of the information in there before they take whatever

14 position they want to take.  Yes, ma'am.

15         MS. THOMPSON:  I would ask, Your Honor, that the

16 affidavit that I filed remain under seal and ex parte but

17 remain as part of the record.

18         THE COURT:  It is.  It has currently been filed ex

19 parte, meaning it has been served only on the Court and not

20 on opposing counsel.  It is at Docket Number 284.  And there

21 are two different attachments to it, and none of that has

22 been served on counsel for the government other than the item

23 I referred to earlier, which is Exhibit B to your ex parte

24 affidavit.

25         MS. THOMPSON:  That exhibit would also remain

1  under seal; is that right, Your Honor?

2  THE COURT:  Yes.  I provided it to the government

3  so they could have it for this proceeding, but it is not to

4  be made public.  Ms. McIntyre, Ms. Thompson has said that she

5  has been directed by her client to withdraw the motion to

6  continue.  What's the position of the government?

7  Is that a fair characterization of your position,

8  Ms. Thompson?

9  MS. THOMPSON:  Yes, Your Honor.

10  MS. McINTYRE:  Would you want me to --

11  THE COURT:  I can hear you better.  Thank you.

12  MS. McINTYRE:  Your Honor, as we stated in our

13  opposition to the defendant's motion on Friday, we think

14  there is certainly no evidence, no basis for the motion to

15  continue in this case.  I am happy to speak more specifically

16  to whatever what we suppose is in the sealed attachments.

17  But are you comfortable with me doing so in this public

18  forum?

19  THE COURT:  What I want to know is whether you

20  oppose the motion to continue knowing what I have handed you

21  and that it could result in collateral litigation some day.

22  MS. McINTYRE:  Yes, Your Honor, we definitely do

23  oppose it.  We think it is unnecessary, and we also think

24  that the standard setup by 18 U.S.C. Section 4244(a) has not

25  been satisfied in this case, and that just clearly has not

1  been satisfied.

2      Again I could speak more specifically to that, but

3  I don't know how much you want me to get into.

4      THE COURT:  I want to make sure you had formed an

5  opinion.  Ms. Thompson, anything else you want to say?

6      MS. THOMPSON:  No, Your Honor.  I do have another

7  preliminary matter about something else.

8      THE COURT:  Let me rule on this first.  I am going

9  to allow you to withdraw the motion to continue.  And I have

10 looked at what you filed, and I have looked at the standard

11 under 18 U.S.C. Section 4244 and don't think that there is

12 substantial information that's required under that particular

13 statute, so we're going to go forward with the sentencing

14 today.  I will put my reasons in more detail in writing filed

15 under seal after this proceeding.

16     Ms. Thompson, you also had a motion to exclude

17 certain written statements and witnesses.  Is that what you

18 wanted to address?

19     MS. THOMPSON:  No.  I was just going to address

20 Mr. Simmons' presence.  He is here today just to assist me.

21 It was pretty complex matter with lots of paperwork, but he

22 is not to be entered as counsel of record.

23     THE COURT:  If he is sitting there, he is counsel

24 to this proceeding and he is counsel of record.

25     MS. THOMPSON:  Okay.  I just didn't want --

1          THE COURT:  You either are or you aren't.  I am
2    not trying to trap you into further work.
3          MR. SIMMONS:  That's fine.
4          THE COURT:  The record needs to reflect that he is
5    here and representing Dr. Moon and assisting Ms. Thompson.
6    He is welcome here.  He is a fine lawyer.
7          All right.  The first thing I need to do is
8    determine whether Dr. Moon has read the presentence report.
9    Ms. Thompson, has Dr. Moon read the presentence report?
10          MS. THOMPSON:  Yes, Your Honor, she has been
11    provided a copy of presentence report.  She's reviewed it,
12    and we have discussed it.
13          THE COURT:  All right.  There are a number of
14    objections.  There is an objection to the intended loss.
15    There is an objection to the number of victims enhancement.
16    There is an objection to the sophisticated means enhancement.
17    There is an objection to the risk of death or serious bodily
18    injury enhancement.  There is an objection to the vulnerable
19    victim enhancement.
20          The government objects to that as well.  The
21    government seeks a four-level increase, and the defendant
22    seeks no increase.
23          There is an objection to the abuse of trust or use
24    of special skill enhancement.  There is an objection to the
25    obstruction of justice enhancement.  Those are by the

defendant.

The government objects to the lack of a
recommendation regarding fine.

The defendant also objects to the summary of the
offense conduct and the victim impact and the lack of a
recommendation for voluntary surrender.

And there is an objection regarding a ban on
healthcare employment if it constitutes a lifetime ban rather
than a condition of supervised release.

And then there is a motion to exclude written
statements and oral testimony of former patients.

It is my understanding that the government would
have the burden of proof on the enhancements. Do you agree,
Ms. McIntyre?

MS. McINTYRE: Yes, Judge.

THE COURT: Okay. Is there anything anybody else
wants to say about the motion to exclude written statements
and oral testimony? The government filed a response, and I
of course had the initial motion.

MS. McINTYRE: Your Honor, I would like to address
two things. First we just wish to inform the Court that the
three out-of-state witnesses did travel all the way, and they
are here. And we wanted to mention that we would like to
invoke the rule but on the other hand point out that under
the victims rights law, victims they have the right, and I am

quoting, not to be excluded from any such public court
proceeding unless the Court after receiving clear and
convincing evidence determines the testimony by the victim
would be materially altered if the victim heard other
testimony at that proceeding.

Thus, our position is that the victims, even those
who are testifying, have the right to remain in the
sentencing hearing during other people's testimony, but we
wanted to flag this issue for the Court so that you are aware
of it and they are in here right now.

THE COURT:  Ms. Thompson.

MS. THOMPSON:  Yes, Your Honor.  I would like to
address the Court and state that I believe that the
government at this point is being disingenuous with us.
During the trial in this matter, the defendant wanted to put
in proof about outcomes of patients, and at that time the
government argued that patient harm was not an issue.  That
this was a fraud case.  Now, at this point in the proceedings
at the sentencing hearing, they want to put in patient harm
as an aggravating factor.  And I'd say, one, that's
disingenuous for them to change their argument, and then,
two, that the patients in this matter do not meet the
statutory definition of victim.

First of all, this is not a malpractice case.
This is not a medical malpractice case.  This is not a tort

claim.  This is a fraud matter.  And, Your Honor, if you
specifically look, one, at the victims' rights statute which
the government has cited, it is 18 U.S.C. 3771 of course, it
says that they have to show that a victim is defined under
Subsection E as a person directly and proximately harmed as a
result of the commission of the federal offense.  And Your
Honor, I would state that there is actually an enhancing
factor to the fraud charge that if the government can prove
beyond a reasonable doubt that the person has caused somebody
bodily injury that that's an enhancement and actually ups the
statutory mandatory minimum or sets a mandatory minimum in
terms of a sentence.  It is statutory.  If the government was
not able to indict Dr. Moon based on that statute that
because it specifically statutory provision that the
government cannot now claim at sentencing and enhance my
client's sentence based on victims when they weren't able to
show that.  That would just be a clear violation of Booker.
So I would say that they can't bring in the victims now.

Furthermore, Your Honor, in terms of who is a
victim, the government claims in -- that these people that
the patients would be victims because they were proximately
harmed as a result.  They said that they in paragraph 3 on
the first page of their motion say these patients are
directly and proximately harmed by Dr. Moon's healthcare
fraud in that they were either definitively shorted on their

full dose of the cancer treated drugs or they may have been so shorted.

Well, Your Honor, at this point they don't have proof and even by a preponderance of the evidence certainly not beyond a reasonable doubt that any one particular person that they are going to call to testify or that letters have been presented from were either one of even specifically shorted a dose. All the government has is a total amount of drugs purchased and a total amount of drugs billed for. So, one, they couldn't show that anyone was specifically shorted a dose. And then, number two, they cannot show that a person was harmed. I mean next they have to show direct and proximate harm. And the government cannot show which individual was proximately harmed or directly harmed by either having a shortage dose. That that somehow would have affected their outcome medically. So those two things they cannot show.

And then finally, Your Honor, the defense did present at trial some evidence that showed the Dr. Moon had a good outcome as to her patients that she treated. Dr. Foon when he testified specifically said -- I have the cite in the rough transcript.

THE COURT: I remember his testimony.

MS. THOMPSON: So, Your Honor, he said that overall her results were better than most results. So I

1 would say based on that then there is no showing whatsoever

2 even just a preliminary matter that there is any approximate

3 or direct harm caused to these people.

4      I cited in my motion and would just point to the

5 case of United States versus Jacqueline Carol Yager.  And in

6 that case they just talked about this was more of a loss and

7 who was a victim, but this is a Sixth Circuit case where they

8 specifically said that people who might have lost money -- it

9 was about losses in money.  That a person who might have lost

10 some money in a banking scheme if the money had been replaced

11 or it was just for a short time or a small amount that they

12 would not be considered victims.  And I'd say the same is

13 here, Your Honor.  If it is too vague.  And specifically the

14 guidelines say that emotional harm is not harm that you can

15 consider in determining a victim.  So I would say

16 specifically based on that, there is no showing that these

17 people should not be considered victims.  And therefore, they

18 don't meet either the guideline enhancement definition and,

19 two, the statutory victim rights law so, therefore, their

20 testimony would be irrelevant as to the sentencing factors in

21 this matter.  And I'd ask that the letters from those people

22 be stricken and that they not be allowed to testify at this

23 point.

24      THE COURT:  All right.  Thank you.  Here is my

25 view.  Under 18 U.S.C. Section 3553(a), the Court is to

consider as a sentencing factor the nature and circumstances
of the offense, and that includes relevant conduct.  To the
extent that the government can produce evidence that cancer
patients received partial doses of medication, I think that
would be relevant conduct regarding the nature and
circumstances of the offense.

As for the Crime Victims Rights Act, I believe
someone who has received any partial doses of needed
medications would be a victim under that act and would have a
right to be present and to testify before the Court.

There is a tension between Rule 615 which is
commonly just called the rule in terms of sequestration of
witnesses and the Victims Rights Act.  However, on closer
examination, I think that can be resolved in most cases in a
fairly straightforward way in that the rules of evidence
don't apply at sentencing so that means as a matter of law
Rule 615 doesn't apply at a sentencing hearing.  It is
something that should be considered so that you don't have
witnesses conforming their testimony with one another, but it
is not mandatory at a sentencing hearing and balancing the
victims right against the nonmandatory Rule 615 at sentencing
I am going to allow anyone who feels like they are a victim
to remain present and to listen to these proceedings.  To the
extent that it appears that there are efforts to conform
testimony, then I reserve the right to change my mind during

1   the course of the proceeding.

2           In terms of the rules of evidence not applying, I

3   am relying on Federal Rule of Evidence 1101(d)(3) which says

4   the rules other than with respect to privilege do not apply

5   in the following situations and lists sentencing.

6           So I am resolving the motion to exclude written

7   statements or oral testimony of former patients by denying it

8   for those reasons.

9           Ms. McIntyre, since you have the burden on the

10  objections, who would you like to call as your first

11  witness?

12          MS. McINTYRE:  Your Honor, we call Dr. Mace

13  Rothenberg, and I would just note I am not going to rehash

14  matters that we have already covered with him in the trial.

15  Just new matters.

16          THE COURT:  All right.

17                  DR. MACE ROTHENBERG

18  was called, and being first duly sworn, was examined and

19  testified as follows:

20                  DIRECT EXAMINATION

21  BY MS. McINTYRE:

22  Q.   Good afternoon.  In the course of your review of the

23  patient files that you have looked at in this case, did you

24  have the opportunity to form an opinion about whether

25  defendant Dr. Young Moon's conduct created a risk of serious

1  bodily injury or death to any of her patients?

2  A.    Yes, I did.

3  Q.    Can you describe what your opinion was in that regard.

4  A.    When we embark upon treatment of any patient, the

5  treatment is usually based on prior experience published in

6  the medical literature based on the results of clinical

7  trials.  Those trials outline what drugs to use, what doses

8  to use, how often to give them and what the outcomes as well

9  as side effects might be.

10        We then base our treatment of patients on those

11  studies.  When we counsel patients regarding how they may

12  benefit and what the risks and benefits are of that

13  treatment, it is based on those studies which those doses of

14  those drugs were given in that schedule.  If we deviate

15  substantially from that, we can no longer guarantee or even

16  feel assured that those outcomes will be achieved.  And,

17  therefore, I think that that's the basis upon which we treat

18  our patients, and that's the trust that they instill in us

19  when we enter into the physician-patient relationship.

20  Q.    Okay.  And in this case I think you -- is it correct

21  that you previously testified that the defendant wasn't

22  necessarily adhering to clinical trials anyway in her courses

23  of treatment?

24  A.    Right.  In the review that I performed on the 27 patient

25  records, the side effect profiles in six of those patients

1    were such that I felt it was highly unlikely that the patient

2    received the doses of drugs that were recorded in the

3    records.   And, therefore, I think that unless we have a

4    reason for adjusting the doses substantially and we discuss

5    any deviation from the published standard doses and drugs,

6    then we really haven't informed our patients adequately, and

7    I think that we violated that trust.

8    Q.    And in what way does that lack of information to

9    patients and violation of trust create a risk of death or

10   serious bodily injury to patients?

11   A.    With many, if not all, chemotherapy drugs, there is a

12   lower limit of effect that if you give substantially lower

13   doses than have been given in the clinical trials then you

14   won't be able to get the beneficial effect that was intended

15   and, therefore, that patient could have been harmed by being

16   denied that benefit.

17   Q.    And when you talk about harm and possible harm, is

18   that -- how big of a risk is that when you are dealing with

19   cancer patients?

20   A.    Well, it is very difficult to talk about in individual

21   patient but in general if you deviate by giving lower doses

22   then one would expect that you would have less benefit from

23   those drugs to a point where you can actually lose any and

24   all benefit from that therapy that was intended and,

25   therefore, that patient is at higher risk for having their

cancer progress or return and potentially die from that.

Q.    Okay.  So in your mind based on your review, did you conclude that the defendants' conduct created a risk of death or serious bodily injury?

A.    I think that the actions in those particular patients were consistent with that conclusion, yes.

Q.    Nothing further.

            THE COURT:  Ms. Thompson.

            MS. THOMPSON:  Yes, Your Honor.  May I have just one moment?

            THE COURT:  Take your time.

                        CROSS-EXAMINATION

BY MS. THOMPSON:

Q.    I want to understand, Doctor.  You said that there are certain guidelines developed by clinical studies; is that correct?

A.    Those clinical trials are done with doses given at certain way, dose, schedule.  The results that are obtained from that whether this therapy has been beneficial to the patient is derived from that data.  The more we deviate from that, the less we can be certain that that benefit will be derived.

Q.    So the schedule includes both the amount of drugs given and the timing at which they are given?

A.    And the frequency, yes.

Q.     So you are saying that in standard cancer treatment
there is never a deviation from that schedule?
A.     That's not what I said.   There are commonly deviations
from them.   Minor adjustments that are made for doses and
sometimes for schedule because of mitigating circumstances.
Other diseases that the person may have.   How frail the
patient may be.

When we do deviate from published trials, we will
discuss this with the patient, discuss our reasons for that
and, therefore, the patient could understand and give truly
informed consent to proceed with therapy.
Q.     When you deviate from the patient trials for these
mitigating reasons, would you consider that to be a risk of
harm to the patient?
A.     Not always.
Q.     Sometimes if you deviate from this schedule based on the
frailty if you are making a medical decision based on the
frailty of the patient, the stage of the cancer, other
diseases, is that somehow harmful or dangerous to the
patient?
A.     It has the potential depending on how much you deviate,
so commonly deviations can be made in terms of ten percent
reduction in dose, for instance, or an adjustment of schedule
instead of giving four weeks on, two weeks off be given two
weeks on and one week off, so that the overall treatment time

is exactly the same so those kind of deviations are commonly
done.  They are discussed with the patient so that they
understand what kind of changes are being made and that they
also have to understand that the data that's been presented
to them in terms of the benefit is now maybe a little bit
less reliable, but they are willing to accept that.  And that
will be discussed ahead of time with the patient so they can
be fully informed.

Q.    In general, you can never guarantee an outcome of the
patient; is that correct?

A.    Not with an individual patient, correct.

Q.    And you said that lower doses -- you said it was
difficult to tell in a specific case or an individual case
what the risk would be; is that right?

A.    Clarify that.

Q.    You cannot tell me in one individual person's case if I
were to pick a name of a patient, you cannot tell me
specifically what the risk was to that individual person in
terms of having a lower dosage?

A.    I don't think you can put a number on it.

Q.    You couldn't even be certain that the lower dosage had
an effect statistically you can look at a large group of
people but on an individual person you can never know for
sure what had an effect and what didn't; is that correct?

A.    Correct.

1  Q.     No further questions.

2              THE COURT:   Any redirect?

3              MS. McINTYRE:   Can I have one moment, Your

4  Honor?

5              THE COURT:   Yes, ma'am.

6                    REDIRECT EXAMINATION

7  BY MS. McINTYRE:

8  Q.     Is controlled deviation from medicine schedule what

9  happened in your review of the six patients?

10  A.     No.

11  Q.     Is it ever acceptable to deviate from the schedule

12  without discussing that with the patient?

13  A.     I think in terms of fulfilling informed consent so the

14  patient could make a appropriate decision for themselves, but

15  that's not appropriate.   So in my own practice when I will be

16  deviating, I will explain why I am changing it from the

17  standard and the reasons for that and so that the patient may

18  understand and accept or decline that treatment.   So I think

19  it is very important to explain that to the patient ahead of

20  time.

21  Q.     And when there is a lack of informed consent in your

22  opinion, does that itself create a risk of serious bodily

23  injury to cancer patient?

24  A.     Potentially because we could never assume what our

25  beliefs are applied to that patient in terms of willingness

to accept risk and benefit in that ratio.

Q.    Thank you, sir.

        MS. THOMPSON:  I do have a followup.

        THE COURT:  Okay, go ahead.

                    RECROSS-EXAMINATION

BY MS. THOMPSON:

Q.    You are saying that a person needs to have consent, a patient needs to consent.  If they don't, they risk serious bodily injury?

A.    I think there is a process of consent, not just a written form that there is a discussion ahead of time that includes making sure the person understands their disease the treatment option is the risks and benefits of those treatment option and that's part of the initial interaction between the patient and physician and family and sometimes the patient will disagree with the physician and will seek other medical care.  That's only after there is this kind of communication.

Q.    But that has to do with either trust or the relationship between doctor patient.  What the patient knows about their treatment does not cause or prevent serious bodily injury, right?

A.    I think it is their understanding and willingness to accept that risk benefit ratio that's important here.

Q.    But that's different than it causing serious bodily injury.  What I understood the U.S. Attorney's question to

1  you to be was the lack of this consent and the lack of this
2  information, does it increase the risk of serious bodily
3  injury?  And your answer was yes?
4  A.    I think that if the patient is not fully informed then
5  their risk of benefit may have been impaired by an ad hoc
6  reduction in doses or the risk of harm may have been
7  increased again by the same kind of ad hoc adjustment of the
8  doses.  And they have not been made a part of this discussion
9  so that they could make the decision and after all, it is the
10 patient that's being affected by all of this and they should
11 have the final say and be fully informed so they can make the
12 appropriate decision for themselves.
13 Q.    Maybe I am not communicating my question clearly.  It
14 doesn't matter what the patient knows or thinks about whether
15 or not they are caused serious bodily injury.  Do you
16 understand what I mean by serious bodily injury?
17 A.    I don't agree with that doesn't matter what the patient
18 thinks or knows.  It does matter what the patient thinks or
19 knows, and that is conveyed by the physician as part of their
20 responsibility.
21 Q.    But it doesn't change whether or not they suffer serious
22 bodily injury.  They might have chosen --
23 A.    It changes their risk.
24         THE COURT:  You guys take turns.  You are talking
25 over each other.  Go ahead with your question.  State your

1  question again, please.

2  BY MS. THOMPSON:

3  Q.    It might change the decision that they make.  It might

4  change their relationship with their doctor.  But it does not

5  physically change what would happen with the medication or

6  would not happen with the medication.  Consent or knowledge

7  doesn't change the physical outcome to the person's body; is

8  that correct?

9  A.    I am afraid I don't understand the question.

10 Q.    My question is you said that there was a risk to serious

11 bodily injury if the patient did not know what form of

12 treatment they were receiving.  Can you explain that in more

13 detail for me what do you mean by that?

14 A.    Well, in an extreme case I could say I am giving you

15 therapy to prevent recurrence of your cancer and you say

16 well, I think given what I know that that is reasonable.  And

17 then I can turn around and give none of therapy.  That would

18 increase that patient's risk of having a relapse and death

19 from that and have the potential to cause serious bodily harm

20 up to and including death.

21 Q.    But it is not the conversation that occurs between the

22 two people that changes whether or not there is a risk of

23 death.  It is the specific treatment they are receiving?

24 A.    Correct.

25 Q.    So whether a person knows what treatment they are

1  receiving or not doesn't increase or decrease their serious
2  bodily injury.  It is the treatment itself; is that what you
3  are saying?
4  A.    Yes, I guess that would be true.
5  Q.    Okay.
6           THE COURT:   Anything else from this witness?
7           MS. McINTYRE:  No, Judge.
8           THE COURT:   Thank you, sir.
9           (Witness excused.)
10          THE COURT:   Who is our next witness?
11          MS. McINTYRE:   Your Honor, we call Sharon Matheny.
12          THE COURT:   All right.  If she could step forward,
13 please.
14                   SHARON MATHENY
15 was called, and being first duly sworn, was examined and
16 testified as follows:
17                 DIRECT EXAMINATION
18 BY MS. McINTYRE:
19 Q.    Good morning.  Or good afternoon, Ms. Matheny.
20 A.    Good afternoon.
21 Q.    Where did you go to college?
22 A.    I went to Middle Tennessee State University in
23 Murfreesboro.
24 Q.    When did you graduate with, what degree?
25 A.    I graduated in December 1981 with a Bachelor's in

1  accounting.

2  Q.   Where do you currently work?

3  A.   I work for the Tennessee Bureau of Investigation.

4  Q.   And what is your position there?

5  A.   I am an auditor for in the Medicare Fraud Control Unit.

6  Q.   What does that mean?

7  A.   The Medicaid Fraud Control Unit or Auditor 4?  I am

8  sorry.

9  Q.   Auditor 4, please.

10  A.   Auditor 4.  I am my position assists the other agents in

11  the unit with the preparation of spreadsheets and accounting

12  issues to help them prepare and document their case for

13  presentation to juries, courts, et cetera.

14  Q.   Okay.  How, if at all, do you use your accounting

15  background in your current job?

16  A.   I will get documentation from the various agents.  It

17  may be bank records, invoices, billing records, and I take

18  those records, analyze them and document them in spreadsheets

19  to present to further explain in a summary method the

20  documentation.

21  Q.   As part of your job, have you been asked to do some work

22  on the investigation of the defendant insofar as this

23  sentencing hearing is concerned?

24  A.   Yes, I have.

25  Q.   And what were you asked to do just for this sentencing

1  hearing?

2  A.    I was asked to review the spreadsheets that the agent

3  prepared.   They were the intended fraud worksheets.   They

4  were summary worksheets.   Patient listing for the various

5  drugs.   And private other insurance company records.

6  Q.    Okay.   And did you review some trial exhibit or parts of

7  trial exhibits in order to do that?

8  A.    I did.

9          MS. McINTYRE:   I'd like to first show the witness

10  what we're marking as Government's Exhibit 1 and due to me

11  being a little bit slower although I am doing well today, I

12  am asking my co-counsel to help by handing copies out to

13  everyone.

14          THE COURT:   That's fine.   Thank you.

15  BY MS. McINTYRE:

16  Q.    Do you recognize this document, ma'am?

17  A.    Yes, I do.

18  Q.    What is it?

19  A.    It is the intended fraud amount summaries for the three

20  separate drugs Taxol, Procrit and Camptosar, and the fourth

21  schedule is the summary of all three drugs that summarizes

22  the total.

23  Q.    Do you know who created this?

24  A.    Bob Turner.

25  Q.    And he is the agent with the Department of Health &

Human Services on this case?

A.    Yes.

Q.    Can you briefly explain to the Court what Table 1 shows in terms of what it means by the total amount billed by Dr. Moon from insurance for treating patients with Taxol or Onxol during the indictment time period?

A.    The total billed figures and intended figures are the total that was billed by Dr. Moon and this was during the trial we had spreadsheets that showed the amount billed, the amount received that she received.  And this total bill for Medicare I took the summary, the spreadsheets from the trial and summarized for Taxol for that one drug how much was the total billed for Medicare, TennCare, private Blue Cross Blue Shield and private other insurance companies.

Q.    Okay.  And what was the total amount that the defendant billing during the indictment time frame as shown on this chart?

A.    For Taxol, it was $1,559,483.80.

Q.    And does the chart then apply the fraud percentage shown at trial to that figure to determine the amount of intended or billed loss?

A.    Yes, it does.

Q.    Okay.  And what was that total for Taxol Onxol?

A.    For the amount of intended fraud loss for Taxol, it was $763,201.

Q.    Does that translate into the amount that the defendant
actually billed these insurance companies for Taxol Onxol
when she did not actually deliver those drugs?

A.    Yes, ma'am.

Q.    And were you able to verify that the amount on that this
chart is accurate?

A.    Yes, I did.

Q.    Turning to Table 2, the next page of this exhibit, is
this roughly the same analysis as applied to the drug
Camptosar during the indictment time frame?

A.    Yes, it is.

Q.    Were you able to determine if this table was also
accurate?

A.    Yes, I was.

Q.    Okay.   And was it accurate?

A.    Yes, it was.

Q.    And in this table, does it apply the percentage from the
trial, the fraud percentage shown at trial for Camptosar?

A.    Yes, it does.

Q.    And when applying that fraud percentage for Camptosar,
what does this table and your analysis reflect was the total
amount of intended or billed fraud loss for that drug?

A.    $479,813.

Q.    Okay.   And turning to the next table, Table 3 in this
exhibit, does this apply the same analysis as we have been

1  discussing to the drug Procrit?

2  A.     Yes, it does.

3  Q.     And does it also apply the fraud percentage shown at

4  trial for Procrit to the amount that she billed total for

5  that drug?

6  A.     Yes, it does.

7  Q.     What was the total amount of intended or billed fraud

8  loss for Procrit during that time frame?

9  A.     $52,639.

10 Q.     And turning to -- was that analysis on Table 3, was that

11 also accurate?  Could you verify it?

12 A.     Yes, it was accurate.

13 Q.     Turning to Table 4 I think you already said this, but

14 does this simply add up the totals that we have just gone

15 through on Tables 1 through 3 to the total amount for all

16 three drugs during the indictment period?

17 A.     Yes, it does.

18 Q.     And what is that total?

19 A.     $1,295,653.

20 Q.     What does that figure represent?

21 A.     That figure represents the intended amount of fraud loss

22 based on the total that Dr. Moon billed which was determined

23 during the trial times the individual fraud percentage rates

24 which were also proven during the trial.

25 Q.     So she submitted bills for these amounts, and this

corresponds with the percentage of those bills that was

fraudulent?

A.    Yes, ma'am.

Q.    Was that all accurate, everything in Table 4?

A.    Yes, ma'am, it was.

            MS. McINTYRE:  We move Government Exhibit 1 into

evidence.

            THE COURT:  Granted.

BY MS. McINTYRE:

Q.    I would next like to show you Government Exhibit 2.  Do

you recognize this exhibit?

A.    Yes, I do.

Q.    What is it?

A.    It is the list of patients that were private other

insurance companies meaning we had private Blue Cross Blue

Shield and then we had private other.  And those are the

other individual private insurance companies which were

billed by Dr. Moon for services.

Q.    So these patients necessarily didn't have Medicare or

TennCare; is that right?

A.    Yes.

Q.    And is that a list of -- and who prepared this document?

A.    Bob Turner with HHS.

Q.    Okay.  I'd next like to show you Government's Exhibit 3.

Do you recognize this exhibit?

1  A.    Yes, I do.

2  Q.    What is it?

3  A.    It is an exhibit of the applied views of the patient

4  histories from Dr. Moon's office.

5  Q.    Okay.  And did you use the information in Exhibit 3 to

6  determine if the chart in Exhibit 2 was accurate?

7  A.    Yes, I did.

8  Q.    Can you walk the Court through how you were able to

9  verify what's in Exhibit 2 by the raw data in Exhibit 3?

10  A.    On page 1 it is U.S. 385.

11  Q.    Are you talking about three, right?

12  A.    Exhibit 3, yes, ma'am.  The patient name it is Chart

13  Number 150, and the name on it is Charlene Less.  It shows

14  here from looking at this applied view that the patient had

15  private insurance summarized by HP.  And it shows the drugs

16  that she was administered and I used that Charlene Less is

17  the first patient that's on Exhibit 2, and the HP shows her

18  insurance private other insurance as HP on Exhibit 2.

19          MS. THOMPSON:  Your Honor, at this point I am

20  going to object to this testimony as being irrelevant to

21  what's going on.  These are other insurance companies.  They

22  were not included in the indictment, Your Honor.  And I would

23  say that under Booker they don't come in.  The guidelines may

24  be advisory, but we still have the rule of Apprendi in that

25  there is no reason for the government to present proof that

1  is not part of the indictment in terms of enhancing sentence.

2          THE COURT:  Response.

3          MS. McINTYRE:  It is relevant conduct, Your Honor.

4  And the sentencing guidelines which of course are a factor

5  that the Court must consider as part of its decision

6  specifically has a provision about the number of victims.

7  And as defense counsel pointed out earlier, one of those

8  victims' provisions has to deal with economic loss.  This

9  portion of the testimony about loss to other private

10  insurance companies is directly on point to that issue, which

11  of course is a sentencing guideline consideration.

12          THE COURT:  I am going to overrule the objection.

13  Think it goes to the enhancement that's proposed in the

14  presentence report regarding the number of victims and

15  whether any of these insurers are victims.  Go ahead.

16  BY MS. McINTYRE:

17  Q.    Ma'am, I just want to make sure that everyone

18  understands because I know this chart has a lot of different

19  entries on it.  When you say HP, are you referring to the

20  column that says Carrier and then says Pay -- looks like it

21  stands for Pay Source.  Is that where HP is listed repeatedly

22  for this patient?

23  A.    Yes, it is.

24  Q.    Is HP in your judgment, is that another private insurer?

25  A.    That's private other insurer.

Q.     And does the fact that her applied view lists HP as her private insurer, is that what Exhibit 2 states for her as her primary insurance?

A.     Yes, it is.

Q.     Okay.  Turning to the next page of Government Exhibit 3, does that refer to patient Paul Olandorf?

A.     Yes, it does.

Q.     What does this document indicate that his first and secondary insurance companies are?

A.     Page one shows his primary is CNL.  And page two shows a secondary of CON.

Q.     And turning to the next patient, Lyla Powell, what is shown for her as her private other insurance?

A.     COMG.

Q.     And turning to the next page for patient, Udean Richardson, what insurers are shown for him?

A.     At first it shows TennCare, and secondly it shows UCT.

Q.     Is that listed next to a bill for the drug Procrit on the page Bates stamped U.S. 555?

A.     Yes, it does.

Q.     Does that indicate that UCT was his secondary insurer after TennCare?

A.     Yes, it does.

Q.     Turning to the next patient entry on U.S. 565 of Government Exhibit 3, is that for patient Ruby Simpson?

A.    Yes, it is.

Q.    And are there several private other insurance carriers listed for her?

A.    Yes, there were.

Q.    Can you tell us who they are.

A.    MC1, USA HW, AFLAC and STERL.

Q.    And do those correspond with the private other insurance companies listed on Government Exhibit 2 for this patient?

A.    Yes, they do.

Q.    Turning to the next patient on Government Exhibit 3, Janet Stout, what private other insurance carrier is listed for her?

A.    CS.

Q.    Okay.  And turning to the next patient, Sheila Taylor, what private other insurance is listed for her?

A.    CTR and USAA.

Q.    And for the following patient Larry Turner, what does Government Exhibit 3 show as his private other insurance carrier?

A.    PLIC.

Q.    And for the last patient here, Shirley Wyatt, what is shown for her private insurance carrier?

A.    MM and UHC.

Q.    Okay.  And by going over this review in Government Exhibit 3, were you able to verify that all of the

1  information in Government Exhibit 3 was correct and accurate?

2  A.    In Exhibit 2?

3  Q.    I am sorry, yes.

4  A.    Yes, ma'am.  It was accurate.

5  Q.    Okay.

6          MS. McINTYRE:  We move Government Exhibit 2 into

7  evidence.

8          MS. THOMPSON:  Your Honor, I object at this time,

9  one, based on my previous reasons but also in the fact that

10  this chart is wrong.  The witness testified that on Paul

11  Olandorf, his primary insurance was CNL and secondary was

12  CON, and that's not reflected on the chart.

13          Also testified on Udean Richardson, the primary

14  was TennCare and the secondary was UCT, and that's not

15  reflected on the chart, so I object to this Government

16  Exhibit 2 coming in as being incorrect.

17          THE COURT:  Response.

18          MS. McINTYRE:  Your Honor, as for Paul Olandorf,

19  we're happy to have a witness draw an arrow reversing CON and

20  CNL for him.  As for Janet Stout, this chart is just about

21  private other insurance; therefore, TennCare necessarily

22  wouldn't have been listed as, but we're happy to have her

23  make a notation to that effect if you wish.

24          THE COURT:  Well, this is for private insurance.

25  TennCare is not a private insurer, and if you want to make an

1  adjustment based on who is the first insurance versus second

2  insurance on Mr. Olandorf, you are welcome to do that.  I

3  think it is admissible.

4          MS. McINTYRE:  Okay.

5  BY MS. McINTYRE:

6  Q.    So it is up to you if you want to draw an arrow.  But

7  whether CON or CNL was secondary or primary, does the

8  Government Exhibit 3 still reflect that they were both

9  insurance?

10 A.    Yes, it does.

11 Q.    Private other insurance for him.  Okay.  I would now

12 like you to try to total the number of private insurance

13 companies affected on Government Exhibit 3.  I am sorry,

14 Exhibit 2.  I apologize.

15 A.    There are 15 private other insurance companies on

16 Exhibit 2.

17 Q.    Okay.  And did all of those appear to have paid bills

18 for the drugs at issue in this case?

19 A.    Yes, they did.

20 Q.    So they would have paid bills for the three drugs at

21 issue during the indictment time frame for these patients?

22 A.    Yes, it appears that they did.

23 Q.    Okay.

24         MS. McINTYRE:  Your Honor, we also move Exhibit 3

25 into evidence although we would note that the applied views

1 were admitted at trial, and these are simply excerpts from
2 the applied views as they pertain to the private other
3 insurers.
4         THE COURT:  Granted.  The objection of the
5 defendant though is preserved.
6         MS. McINTYRE:  I would next like to show the
7 witness Government Exhibit 4.
8 BY MS. McINTYRE:
9 Q.    Do you recognize this document?
10 A.    Yes, I do.
11 Q.    What is it?
12 A.    It is a ranking of the Taxol patients in relation to the
13 amount of fraud that was the fraud difference that was
14 brought out during trial.  The amount that was -- let me
15 gather my thoughts for a second.  I used my prior spread-
16 sheet, and this summarizes them.  And we have the fraud
17 difference for Taxol and then we rank in order we're trying
18 to determine how many victims from for this drug there were
19 and to spread the fraud difference giving her the benefit of
20 the doubt for the patient that were brought out during trial
21 to have gotten partial dosages they are brought out as if
22 they got none to lessen the number of victims.
23 Q.    And who created this document?
24 A.    Bob Turner created this.
25 Q.    Okay.  And did you make an effort to verify his work?

1  A.    I verified the work, yes, ma'am.

2  Q.    Was it accurate?

3  A.    It was accurate.

4  Q.    Okay.

5       MS. McINTYRE:  We move Exhibit 4 into evidence.

6       THE COURT:  Granted.

7  BY MS. McINTYRE:

8  Q.    Just sort of going through this chart, the first part of

9  Exhibit 4, does that list the Taxol patient who got partial

10  doses per Dr. Rothenberg's testimony?

11  A.    Yes, it does.

12  Q.    And are those patients Herbert Cordell, Richard DeMars

13  and Howard Edwards?

14  A.    Yes, they are.

15  Q.    And in this chart, does that give the benefit of the

16  doubt to the defendant by assuming that they got zero

17  percentage of the medicine that they were billed for Taxol

18  and Onxol?

19  A.    Yes, it does.

20  Q.    And can you explain does this document, does this chart

21  then subtract the amount of the fraud loss shown at trial,

22  the 51,964 milligrams, and then subtract from that the amount

23  that these three patients got total; is that what it does?

24  A.    Yes, it does.

25  Q.    And even after those three patients are subtracted out

1  and everything that they were charted as getting for that

2  drug, was there still a remaining fraud difference of 36,962

3  milligrams.

4  A.    Yes, there was.

5  Q.    Okay.  And then does the chart next assume that Billy

6  Jones who there was also testimony about at trial him not

7  getting a dose he was billed for, does it also subtract out

8  the total dose that he got ever for Taxol Onxol?

9  A.    Yes, it does.

10  Q.    And then after that is subtracted out, was there still a

11  remaining amount of Taxol, Onxol that hadn't been given per

12  the trial testimony?

13  A.    Yes.

14  Q.    Okay.  And how were the next patients arrived at?

15  A.    The Taxol patients were ranked by the patient that got

16  the highest amount of dosages in milligrams, and so after you

17  take out the first four patients that you previously discuss

18  then we took the next highest and then in decreasing order

19  until the fraud amount was gone.

20  Q.    Okay.  And how many patients did that show could not

21  have if they didn't get any of the dose billed and both by

22  the trial testimony and then by the patient who got the --

23  should have gotten the highest doses per their charts, how

24  many patient total would have been affected under that

25  analysis per these charts?

1  A.    Nine patients.

2  Q.    Okay.   And I noticed that there is a column here for

3  Procrit patient.   Why is that?

4  A.    That is so that we can determine if they also got

5  Procrit so they are not counted twice as victims.   They are

6  only counted once.

7  Q.    Okay.   But just looking at the total number of Taxol

8  patients affect here by this analysis that gives her a lot of

9  benefit of the doubt, that still does that still show that

10 nine patients wouldn't have gotten their full doses of Taxol?

11 A.    Yes, ma'am.

12 Q.    I would next like to show you Government Exhibit 5.

13        MS. McINTYRE:   Your Honor, I am not sure I moved

14 Government 4 into evidence.   If not, I move it.

15        THE COURT:   I don't believe so.   Granted.

16 BY MS. McINTYRE:

17 Q.    Thank you.   Do you recognize Government Exhibit 5?

18 A.    Yes, I do.

19 Q.    What is it?

20 A.    It is the ranking of the Camptosar patient during the

21 indictment time frame to determine -- to spread out the fraud

22 difference that was brought out in trial.

23 Q.    And was this also created by Agent Turner?

24 A.    Yes, it was.

25 Q.    Were you able to verify that the information on this

1  chart is accurate?

2  A.    Yes, it was accurate.

3          MS. McINTYRE:   We move Government Exhibit 5 into

4  evidence.

5          THE COURT:   Granted.

6  BY MS. McINTYRE:

7  Q.    Just briefly does this roughly use the same method of

8  analysis that we just went through with the Taxol Onxol?

9  A.    Yes, exactly.

10  Q.    So the first part of it, does that assume that the three

11  Camptosar patients who Dr. Rothenberg felt did not get full

12  doses that they actually got zero dose and you can subtract

13  that from the fraud amount for Camptosar?

14  A.    Yes, it does.

15  Q.    After that, does it then apply then subtract out the

16  total amount that Sheila Taylor who there was also trial

17  testimony about that she didn't get any of her Camptosar

18  either?

19  A.    Yes.

20  Q.    After those patients are subtracted out, is the next

21  patient the person who was got had the next highest amount

22  charted for Camptosar?

23  A.    Yes.

24  Q.    And how many patients does that show total it would take

25  to account for the fraud loss for Camptosar?

1  A.    Five.

2  Q.    And in that five, does that include an assumption that

3  they all got zero percent of what they were charted for

4  getting as opposed to just a partial dose?

5  A.    Yes.

6  Q.    So in that way it gives her the benefit of doubt?

7  A.    Yes, it gives her the benefit of the doubt on the number

8  of victims.

9  Q.    You mentioned I see again this Procrit patient column.

10  Does that again show who got Procrit and who didn't?

11  A.    Yes, so that they are not included twice as victim.

12  Q.    Okay.  But that shows that there were five Camptosar

13  patients in general who could not have gotten if they are

14  looking at the zero percentage analysis who could not have

15  gotten the full dose; is that right?

16  A.    Yes, ma'am.

17  Q.    I'd next like to show you Government Exhibit 6.

18        Do you recognize this?

19  A.    Yes, this is the list of patients that got Procrit that

20  was prepared by Bob Hunter -- Turner, excuse me.

21  Q.    This covers the indictment time frame?

22  A.    Yes, it does.

23  Q.    Were you able to verify if the information on this chart

24  was true and accurate?

25  A.    Yes, I did, and it was accurate.

1      MS. McINTYRE:  We move Government Exhibit 6 into

2  evidence.

3      THE COURT:  Granted.

4  BY MS. McINTYRE:

5  Q.   Does the first part of this chart simply reflect the

6  patient who only got Procrit as opposed to getting Taxol,

7  Onxol or Camptosar?

8  A.   Yes.

9  Q.   How many were in that group?

10  A.   The ones that only got Procrit were 40.

11  Q.   Forty different people?

12  A.   Forty different patients.

13  Q.   Does the next category show the patient who got Procrit

14  and Camptosar both?

15  A.   Yes.

16  Q.   And when you add those in, what does the number grow to?

17  A.   Forty-seven.

18  Q.   Okay.  Then when you go to the number of people who got

19  Procrit and Taxol together, how many would be on that list?

20  A.   That brings the total to 69.

21  Q.   Okay.  And of course we have already mentioned that some

22  of these Procrit patients also got Taxol or Camptosar?

23  A.   Yes.

24  Q.   When you account sort of avoid double counting those

25  patients, how many individual people are there who either by

1  Government Exhibit 4 and 5 couldn't have gotten their

2  Camptosar and Taxol or who couldn't have gotten Procrit per

3  other trial testimony, how many does that leave?

4  A.    May I see Exhibit 4 and 5 again, please.

5  Q.    Sure.

6  A.    We had 69 on the Procrit list, and then from the Taxol

7  list that was I think it was Exhibit 4, we would have added

8  four which would have been four and 69, 73. And Exhibit 5,

9  we add another two which would bring the total to 75.

10  Q.    Okay. So would that reflect just to be clear that even

11  giving the defendant the benefit of the doubt regarding

12  Camptosar and Taxol and then including all of the Procrit

13  patients during the indictment time frame that there would

14  have been 75 different people who could not or did not get

15  the doses charted and billed for?

16  A.    Yes, ma'am, 75.

17  Q.    Seventy-five different patients?

18  A.    Seventy-five different patients.

19  Q.    Okay. I have nothing further.

20           THE COURT:   Your witness.

21                   CROSS-EXAMINATION

22  BY MS. THOMPSON:

23  Q.    I want to first ask you about this Exhibit 1 that you

24  testified about. Now, I see three -- there is Medicare,

25  TennCare and Blue Cross Blue Shield listed as the top three

1  insurance companies; is that correct?

2  A.    Yes.

3  Q.    Now, for Medicare, TennCare and Blue Cross Blue Shield,

4  each insurance company negotiates their own rate of benefit

5  or charges.  They negotiate with doctors and hospitals, and

6  their providers on their provider list an amount that they

7  will reimburse for a certain product; is that correct?

8  A.    I have no idea.  I don't -- that's not part of my job.

9  Q.    Okay.  So when you are trying to figure out these

10  numbers, you don't know how much each individual insurance

11  company paid for, let's say, Taxol, correct?

12  A.    No.

13  Q.    You don't know how much they paid for a dose of Taxol?

14  A.    No, I just this chart only shows total billed.

15  Q.    Okay.  So if over time between '99 and 2001 the price of

16  Taxol increased per dosage and the contract that the doctor

17  or the provider had with the insurance company to pay back a

18  different amount changed, it is not reflected in these total

19  numbers?

20  A.    No.  It is only thing that is on this exhibit is the

21  total that Dr. Moon billed to the various insurance companies

22  during the indictment period.

23  Q.    Okay.  So work with me here then.  If let's say in the

24  year 1999 there were $500,000 of Procrit billed for let's say

25  during that year she ordered none and it is given a value per

1  dosage like a dollar per vial or a dollar per dose.  That's

2  going to equal a different total than if in the year 2001

3  each vial has two dollars per dose; is that right?

4  A.    That won't have any effect on this exhibit because this

5  exhibit is merely the total that these insurance companies

6  have in their records that Dr. Moon billed them during the

7  indictment period.

8  Q.    But it would vary because if in, let's say, in 1999 is a

9  year that no Taxol was given but yet Dr. Moon billed for the

10 Taxol, if it's got a different rate of reimbursement that

11 does change the formula if then in the year 2001, the rate of

12 reimbursement is higher.  You could alter the amount of

13 intended loss by changing the amount that each dose is

14 reimbursed for if you have different doses that are actually

15 shorted in different years?

16 A.    No, the intended loss on this exhibit is merely based on

17 the fraud percentage that was determined during the trial for

18 the indictment period for each individual drug times the

19 total amount the Dr. Moon billed during the indictment

20 period.  It has nothing to do with reimbursement rate.  It is

21 the total amount that she actually billed.  That she sent for

22 the to the insurance company asking for reimbursement.

23 Q.    So depending on any year it was and how much the Taxol

24 amount was for reimbursement per dosage would not change the

25 total outcome in terms of loss?

A.      Not on this schedule it wouldn't because reimbursement
rate has nothing to do with the amount billed.

Q.      Doesn't that assume that then each year the fraud
percentage is the exact same of 48.939 percent?

A.      No.

Q.      If the first year you have a hundred percent of fraud
and the last year you have zero fraud, would that not then
change the outcome total?

A.      That was the total fraud percentage determined during
trial.  I don't know how else to explain it.  It was based on
the indictment period the total period on what she was paid.
May I get my prior spreadsheets to look at?

Q.      Sure.

A.      During trial the fraud percentage rate as shown on this
Exhibit 1 for Taxol being 48.939 percent, that fraud
percentage rate was determined by taking the drugs purchased
plus the overfill, taking the overfill into consideration,
divided by the drugs purportedly administered, and that's
what determined that fraud percentage rate.  And that was
determined during trial.  Taking that fraud percentage rate
which was over the indictment period, multiplying it by the
total that Dr. Moon billed each individual insurance company,
TennCare, Medicare, Blue Cross Blue Shield and then the
private others together is how we determined or how, excuse
me, how Bob Turner determined the amount of intended fraud

1  loss.

2  Q.    Let me ask you this question.   The Medicare

3  reimbursement amount, did you give her any credit for what

4  might have been the fair value such as the amount that

5  Medicare gives in reimbursement is different than the amount

6  TennCare would give for reimbursement which might be

7  different from Blue Cross Blue Shield.   Do you agree with

8  that?

9  A.    I have no idea.   That didn't come into it.   I got his

10  summaries and determined that the total billed that is the

11  total that Medicare stated during the indictment period Dr.

12  Moon billed them for her patient.   That's the total that

13  Medicare showed as billed.   And these spreadsheets were

14  determined were used during trial and determined to be

15  correct.

16  Q.    Okay.   Here is where I think that the problem the flaw

17  is in this logic if you don't take into account which year it

18  was billed and how much it was billed for like not just the

19  year but when the price changes.   So let's say that you take

20  this 48.9 percent fraud, that's the average fraud over the

21  period of the indictment; is that right?

22  A.    May I restate that?   I believe, okay, we have each

23  individual patient listed on these spreadsheets.   So the one

24  patient his service dates of service were in 2000, 2001.   And

25  they are billed at different dollars billed for units and

1   that.

2   Q.    Right.

3   A.    So I mean this spreadsheet would determine would be

4   different for different years.   Some years let's say he was

5   billed six units were billed $2400.   Other years they might

6   have been billed at $2800 on in latter part of 2001.   So they

7   are actual amounts billed individual date of service all

8   totalled up for all of the patients for one drug and then the

9   difficult -- then the fraud percentage rate is multiplied

10  times the total amount billed.   The fraud rate was determined

11  during the trial for Taxol to be 48.939 percent.

12  Q.    But the fraud rate requires that the same amount of

13  fraud percentage apply to each period when the money is

14  charged.   So if you have a unit of drugs that cost one dollar

15  this year and let's say there is no fraud on that and you buy

16  ten units so there is zero percentage of fraud that year.

17  And then the next year a unit of medicine costs $100 and you

18  bill for 100 units and you if you then bill for 100 units and

19  buy none, that's a hundred percent fraud.   And if the price

20  goes up that second year so that each vial is worth a hundred

21  dollars, that's a thousand dollars worth of fraud the second

22  year and no fraud the first year.   But that assumes that the

23  amounts stay the same for each one each year?

24  A.    No.   The fraud percentage is determined by actual

25  milligrams, and it is over the entire indictment period.   So

you determine your fraud rate by determining how much was
purportedly administered less how much was actually purchased
plus overfill.  You get the difference.  Divide it by the
amount that was purportedly administered, and you determine
your fraud percentage rate.  Then that percentage rate is
multiplied -- you get your amounts billed which are different
for each year for different parts of the year.  And you set
your percentage, your fraud percentage rate against total
amount billed so that would not be, in my opinion,
multiplying at different rates because the rate of
reimbursement in that is not taken into consideration in this
spreadsheet.  It is based -- it is totally the total  amount
that Dr. Moon billed to the insurance companies.  So the rate
of percentage I didn't look at that when I determined that
this was correct.  That was not taken into my calculations.

Q.    Okay.

A.    Because the fraud was already -- the percentage was
already determined during the trial.

Q.    Very good.

            MS. THOMPSON:  Your Honor, just one more minute.

            THE COURT:  All right.

BY MS. THOMPSON:

Q.    So just to be clear, since you did not take into
consideration the reimbursement rate, the reimbursement rate
is never the billed rate; is that right?

A.    I have no idea.  I just know from the spreadsheets that
were given during trial and proven to be correct that the
total dollars billed corresponded to the records from the
insurance company as being billed from Dr. Moon, and that's
what this individual exhibit is based on.

                    REDIRECT EXAMINATION
BY MS. McINTYRE:

Q.    The charts that you have been testifying about, they
don't show anything about reimbursement rate, do they?

A.    No, ma'am, they show billing, total billing.

Q.    They just show the total billed amount slash the
intended loss?

A.    Yes, ma'am.

Q.    Okay.  Nothing else.

          THE COURT:  Thank you, ma'am.  You can step down.

          (Witness excused.)

          MR. WILLIAMSON:  Your Honor, can we have a
five-minute break for Ms. McIntyre?

          THE COURT:  Yes, we'll take a five-minute break.

          (A recess was taken.)

          THE COURT:  Who is our next witness?

          MS. McINTYRE:  We call Diana DeWitt.




                    DIANA DeWTT

was called, and being first duly sworn, was examined and

testified as follows:

DIRECT EXAMINATION

BY MS. McINTYRE:

Q.    Where do you live, Ms. DeWitt?

A.    I live here in Nashville.

Q.    And what do you do for a living?

A.    I have about four jobs but between music, business

things, I sing and also I have a clothing line.

Q.    What are the names of your parents?

A.    Donald M. DeWitt and Delores M. DeWitt.

Q.    Are they still living?

A.    My father is.

Q.    Okay.  And is your mother deceased?

A.    Yes.

Q.    What was your -- I am sorry, did you also say Delores

DeWitt was your mother's name?

A.    Yes.

Q.    When did she die?

A.    August 30, 2001.

Q.    Okay.  And was your mother previously a patient of the

defendant Dr. Young Moon?

A.    Yes, she was.

Q.    Approximately when was she her patient?

A.    She was diagnosed with ovarian cancer on her birthday on

1  July 17th, 2000, and she was assigned to Dr. Moon and she was
2  her doctor up until she died.
3  Q.    Okay.   And why specifically was your mother seeing the
4  defendant?
5  A.    It seemed that people that were diagnosed with breast
6  cancer, ovarian cancer and prostate cancer were pretty much
7  assigned to her from her other doctor.   At least that's what
8  I was aware of.
9  Q.    Did your mother have ovarian cancer?
10 A.    Ovarian.
11 Q.    Are you aware of what course of treatment the defendant
12 gave to your mother?
13 A.    I tried to, you know, getting on the internet and learn
14 as much as I could about what was going on, and I was with
15 her for all of the chemo treatments.   I know that she was
16 given Taxol, Paraplatin, those were two that I am positive
17 of.   And also she was taking Procrit too.
18 Q.    Okay.   You mentioned that you were with her for her
19 treatments.   How was this?  Did you drive from Nashville to
20 Crossville?
21 A.    Uh-huh.   Yes, it was about every three weeks or so.
22 Q.    Did you go up for every single one of those treatments?
23 A.    Every time.
24 Q.    Did you stay with your mom during those treatments and
25 afterwards?

1  A.    Uh-huh.  It would be over a course of three, four days I
2  would be there right before, take her there, bring her back.
3          THE COURT:   Would you mind pulling your chair a
4  little closer to the microphone so I can hear you a little
5  better.
6          THE WITNESS:   Sorry.
7          THE COURT:   Thank you very much.
8  BY MS. McINTYRE:
9  Q.    Were you able to observe how your mother responded to
10 her chemo treatments?
11 A.    Yes.
12 Q.    Okay.  And can you describe to us how she responded in
13 terms of her side effects, that sort of thing.
14 A.    She initially lost her hair after the first initial
15 treatment.  She got pretty sick.  She was nauseous, throwing
16 up, diarrhea.  You know, typical things that you read what is
17 going to happen to you.  You know, when you undergo chemo.
18 And that was the initial thing, you know, the hair fell out.
19 Fingernails got messed up.  That kind of thing.
20 Q.    Did her reaction change over time?
21 A.    As she was doing the treatments, it seemed she would not
22 be sick.  She -- her hair started growing back.  She wouldn't
23 be nauseous.  She would have her appetite.  I would -- I
24 loved cooking for her.  I would cook her a meal.  She would
25 sit down and eat it.  She says, I must be getting used to

1  this stuff.  I am not sick.  I feel great.  I want to go
2  golfing, you know.
3          I mean these are some of the things that it just
4  it seemed pretty remarkable.
5  Q.    Okay.  And what did you think about your mother's
6  response at the time?
7  A.    Her mother was still alive and has a very strong
8  constitution.  Lived to be 102.  Outlived mother.  And she is
9  a strong, very strong woman, and we just thought that mother
10 was the same way.  That she just had a very strong
11 constitution and that she had her mind set to beat this, and,
12 you know, that's why she was just -- she just wasn't having
13 the normal reaction that one would have with chemo.
14 Q.    And did your opinion about why your mother seemed to be
15 increasingly responding well to the chemo, did your opinion
16 about that change over time or at a certain point?
17         MS. THOMPSON:  Your Honor, I'd like to object at
18 this point.  I am sure this woman -- and the Court has said
19 she can testify about impact, but it sounds to me like she is
20 giving some medical testimony, Did your opinion about her
21 chemotherapy treatment?  I think that's really calling for
22 medical testimony.  I am just not sure how this is useful,
23 and I would object it this line of questioning.
24         THE COURT:  Response.
25         MS. McINTYRE:  I am happy to change my question

1  slightly, but I think that the question was appropriate.  It
2  gets at this victim's experience and how this court case has
3  affected it, how the whole episode has affected her
4  personally, and that's why a victim is allowed to testify.
5         THE COURT:  I am going to let her testify, but you
6  cannot pose any questions that call for medical conclusion
7  since she is not an expert.
8  BY MS. McINTYRE:
9  Q.    I will just go back add one question first and then get
10 to the other one.  Did you at some point find out about there
11 being a criminal case or investigation of the defendant?
12 A.    I heard it on the news and saw it in the paper after it
13 initially was put out.  Over three years ago when all of
14 this -- I guess I don't know the exact date.  It seemed like
15 it was the summer of maybe 2002.  Maybe it was the fall of
16 2002 when I heard about it.
17 Q.    Okay.  And after you learned about the criminal case
18 against the defendant, did that change in any way your
19 opinion of your mother's response in terms of side effects?
20 A.    From what I read and from the people that I know that
21 have gone through chemo, chemotherapy takes you within an
22 inch of death.  It kills all the living cells.  Fast growing
23 cells.  And it makes you sick as a dog.  And because your
24 body will try to survive, my understanding is this.  That she
25 must not been treated with the chemo doses that, you know,

1  she was taking.  I mean they must have been diluted.  She
2  must have been one of the cases that was being shorted.
3  Q.    And not in terms of a medical, but based on your
4  observation why did you conclude that?
5  A.    Because she wasn't being sick.  Her hair was growing
6  back.  She wasn't losing her appetite.  She I mean chemo is
7  cumulative, and from what I have read and what I understand,
8  I know I am not a medical nurse.
9         MS. THOMPSON:  Your Honor, I object.
10        THE COURT:  I am not going to let her give medical
11  testimony.  She can testify about what information she
12  received and what she concluded from it from a lay point of
13  view, but she is not a medical expert.
14  BY MS. McINTYRE:
15  Q.    After you changed your conclusion about why your mother
16  was responding well to the chemo, how were you affected
17  personally by that changed conclusion?
18  A.    Well, I was very angry, and I didn't think that -- that
19  is why, you know, I got a hold of Andy Corbitt when I found
20  out TBI was investigating.  I just offered any information
21  that I could give from the experience that I had with my mom
22  and her cancer experience with Dr. Moon.  And I just, you
23  know, I appreciate being able to come up here and speak
24  today.  I know I am not a medical person, but I just want
25  things to be fair.

1  Q.    And how has the loss of your mother affected you

2  personally?

3  A.    It has extremely affected my whole family.  My mom was

4  the captain of our team, and we have lost the captain.  It is

5  just totally different now.  And I miss her terribly.  And I

6  ask you to give this woman the maximum.  It is not right that

7  someone takes a medical degree and uses it to their benefit

8  for financial gain.

9  Q.    I am just going to give you a minute, ma'am.

10 A.    I am okay.

11 Q.    I know you mentioned that you talked to Agent Corbitt.

12 Have you been very involved in following this case?

13 A.    I came to as much as the trial as I could.

14 Q.    Did you attend any hearings before the trial as well?

15 A.    I came to one that some new evidence had been given and

16 so they postponed it, and it was very short.  It was a very

17 short morning that day.  And Judge Campbell decided to start

18 the trial later because of new evidence.  So there was that.

19 That was before the trial.

20 Q.    Did you also call me personally and case agents for

21 updates on the case?

22 A.    Yes, I did.  You are on my quick dial.

23 Q.    And did your involvement in monitoring this case take

24 away from your work and personal life in any way?

25 A.    Well, it is, you know, like I said, it has been very

1  hard on my family, and we are very close family.  And, you

2  know, we are just trying to deal with it.  It is one thing

3  losing your mom and then to find out it was because of

4  malicious behavior, it just adds to it.

5  Q.    Is there anything else that you would like to tell the

6  judge in this case?

7  A.    Thank you for listening to me.  And I just hope you find

8  it in your heart to give her the maximum.  That's what I am

9  asking.  And thank you for listening.

10          THE COURT:  Ms. Thompson.

11          MS. THOMPSON:  Your Honor, no questions.  May we

12  approach the bench, please?

13          THE COURT:  Yes.

14          (A bench conference was held as follows:)

15          MR. SIMMONS:  I am Jim Simmons, for the record.

16  Your Honor, it is apparent that there are a number of people

17  here who have lost loved ones.  And I think two things that

18  we object to.  Number one, is giving an opinion as to what

19  the ultimate sentence should be.  I think that's clearly

20  objectionable.  That's for this Court to decide.  Based upon

21  the facts.  They can testify as to what they saw and what

22  occurred to their loved one in the course of cancer.  But I

23  think they also cannot give what in fact is a medical opinion

24  the link between the chemo or lack of chemotherapy and the

25  condition of that patient.  That a medical conclusion.

1        I make an objection because it is clearly

2 inappropriate, but I think it would be unfair to these people

3 to object every time that they begin talking in those terms.

4 I just want to make it clear what our objection is.

5        THE COURT:  Okay.

6        MR. SIMMONS:  I would ask -- it is obvious what

7 their opinion is as to the sentence is give her every day you

8 can.  But I think it is not victim testimony.  I think it is

9 inappropriate victim testimony.  You can announce that, you

10 know, that's your decision and not theirs.

11        THE COURT:  Response?

12        MR. WILLIAMSON:  Your Honor, I will say this first

13 of all.  I would say their opinion on the sentence goes

14 exactly to the point of Victim Rights Act, why they are now

15 legally empowered to speak and be present at sentencing

16 hearings.  I mean, Your Honor obviously can take that in

17 consideration however Your Honor sees fit in fashioning a

18 sentence you think is appropriate.  With respect to the

19 medical opinions we will craft our questions to avoid that.

20 To the extent that they do that inadvertent they obviously

21 have opinions why their loved ones did not suffer side

22 effects that usually see from cancer patients.  I think Your

23 Honor can cure that in crafting sentence you will not take

24 into medical term given by nonexperts, but we will craft our

25 requests.

1      THE COURT: The objection is preserved. You don't

2 need to object every time. Having said that, I am not taking

3 this testimony as medical testimony as to causation,

4 proximate causation. These are lay witnesses talking about

5 matters that they are perceiving in an emotional way, and I

6 take it in that perspective. I am bound by the law. I am

7 going to apply the law to the sentencing, and I am not swayed

8 by quest for this sentence or that sentence. I am going to

9 apply the advisory guidelines 3553(a) and listen to your

10 arguments and apply the law. But they are entitled under the

11 Victims Rights Act to be heard. I am filtering their

12 statement through the fact that they are not experts and that

13 I have to apply the law and their request may or may not

14 comply with the law. In any event, it is not fact. It is

15 their rendition of their state of mind.

16      MS. THOMPSON: Because I think even the last

17 witness that testified her mother died from surgery which was

18 a complication of some intestinal problems and, you know, I

19 am put in the difficult situation do I cross-examine her

20 about that. But then she is not a doctor, so I don't want to

21 cross-examine her and get her medical opinion about the

22 surgery. But, you know, I am not even sure her mother died

23 from the cancer ultimately.

24      THE COURT: You are welcome to talk to her about

25 that. Thank you.

```
 1              (Bench conference concluded.)
 2              THE COURT:   Your witness, Ms. Thompson.
 3              MS. THOMPSON:   No questions, Your Honor.
 4              THE COURT:   Thank you, ma'am.   Appreciate you
 5   coming.
 6              (Witness excused.)
 7              THE COURT:   Ms. McIntyre.
 8              MR. WILLIAMSON:   Call Donelle Bowman.
 9                       DONELLE BOWMAN
10   was called, and being first duly sworn, was examined and
11   testified as follows:
12                    DIRECT EXAMINATION
13   BY MS. McINTYRE:
14   Q.   Where do you live, ma'am?
15   A.   Lexington, Virginia.
16   Q.   And what do you do for a living?
17   A.   I am self-employed as a graphic designer.
18   Q.   Who are your parents?
19   A.   Donald M. DeWitt and Delores Morelock DeWitt.
20   Q.   And is your mother still living?
21   A.   No, she is not.
22   Q.   And was she previously a patient of the defendant?
23   A.   Yes.
24   Q.   Approximately when was that?
25   A.   It was mid July 2000 until her death end of August 2001.
```

Q.     And why was your mother seeing the defendant?

A.     She had been diagnosed with late stage ovarian cancer.

Q.     Are you aware of the medicines that the defendant gave to your mother?

A.     Well, I was there most of the chemos as well and just from seeing records and seeing what was on the little bags of stuff, I know that Taxol was one of the things.  And she did eventually was supposed to be getting Procrit because she did have ups and downs.  That's how I remember it that she did have times where her hair came back, but then she had times where she didn't want to get out of bed.

Q.     You mentioned that you were there for most of the treatments.  Can you explain how it was that if you lived in Virginia you were there for those treatment.

A.     I drove in.  Being self-employed, I could take the time off.  I am married fortunately to a man who makes enough income without mine to handle our household expenses, so I could take four or five days and drive in -- it is six hours from Lexington to Crossville -- and be there to help mom and my dad who was pretty dependent on my mom.

Q.     And were you able to observe how your mother responded to her chemo treatments in terms of any side effects she suffered?

A.     Yes, I was.  It did vary, and in my recollection at first she did get the full impact of what I understood chemo

1    would be, the hair loss and the weakness and tiredness.   But

2    then there was occasionally times where she felt great.   She

3    would be up and around.  I'd still be there because I didn't

4    want her to have to do the laundry and all of that sort of

5    thing, but she still didn't want to see people very often

6    because of the hair loss thing.  But she would be up and

7    around and being as big a part of the family as she always

8    was.

9    Q.    Okay.  And what did you think at the time about how your

10   mother was doing?

11   A.    I don't think I thought that it was because she was

12   getting better.  I just I didn't know if it was if there was

13   reduced amounts, and I didn't know the reason for it maybe.

14   I don't believe it was explained to her, but maybe I thought

15   Dr. Moon had reduced for her benefit if she couldn't take it

16   any more.   But I still it just seemed inconsistent to me.

17   Q.    And at a certain point did you learn about this criminal

18   case?

19   A.    Yes, I did.  My sister who was just up here, she lives

20   here and apprised me of all of the news and that sort of

21   thing .  I am the farthest away so I am the least in contact.

22   Q.    After you learned about the criminal case, how did you

23   feel about your mother's treatment by Dr. Moon?

24   A.    Well, it made me rethink things.  I had thought when Mom

25   was first diagnosed that chemo would only have been

recommended if it would do any good.  She was very late
stages.  And my thoughts after the fact were that my mother
would have had a much better quality of life had she not gone
through any chemo, but then no one would have been profiting
off of her for the chemo drugs.  So I too am very angry.

Q.    How has this experience affected you personally?

A.    Besides being angry, it is very hard to trust
professionals, especially medical people, when at some time
earlier in my life I felt part of a doctor's treatment if you
are ill requires faith and trust.  It is the -- I am a faith
based person.  You need that.  And the positive attitude to
help yourself get better.  And now I question everything.  I
am sorry.  My father he when we discussed coming here today,
he could not bring himself to do this.  He beats himself up
thinking he should have known what was going on.  And he just
it has weakened him.  He is physically healthy.  He is a
healthy 77-year-old man.  But he I don't know if it would be
diagnosed as clinical depression.  I am not a medical
professional, but he there is a piece of him that's missing
and hollow and in pain.  Whenever I am here, I see it.  When
we talk on the phone, I hear it.

Q.    Is there anything that you would like to tell the judge
in this case?

A.    I don't know if this case -- I hope that it has an
impact beyond Dr. Moon.  I would like for it to be well-known

and just to know for other cancer patients to know maybe they
need to question rather than just be trustful and faithful.
And if any other doctors are out there even considering doing
something like this how hurtful and how permanent the damage
can be.  In this case I believe that the crimes here were out
of financial greed and in my impression prison is one thing
but a financial fine, a big penalty would be the most
effective just because it was greed motivated and she needs
to pay.  And I think the money should go to a victims program
or something.  That's just my thought.

Q.    Thank you very much, ma'am.

A.    Thank you.

   THE COURT:  Ms. Thompson.

   MS. THOMPSON:  No questions, Your Honor.

   THE COURT:  Thank you, ma'am.

   THE WITNESS:  Thank you.

   (Witness excused.)

   MR. WILLIAMSON:  Your Honor, the government calls
Shirley Rogers.


        SHIRLEY ROGERS

was called, and being first duly sworn, was examined and
testified as follows:

DIRECT EXAMINATION

BY MR. WILLIAMSON:

Q.    Good afternoon, Ms. Rogers.

A.    Hi.

Q.    Where are you from?

A.    New Bern, North Carolina.

Q.    Ms. Rogers, what do you do for a living?

A.    I am a social worker and chaplain at a 40-physician internal medicine practice with an oncology center in Pottsville, North Carolina.  We have five clinics.  I serve all five mostly as an advocate for indigent patients.

Q.    How long have you worked there?

A.    A year and a half.

Q.    Where did you work before you went to the medical office?

A.    I worked at I was the associate minister for 1200-member Presbyterian Church, New Bern, North Carolina.  I am a ordained presbyterian minister.

Q.    Ma'am, at some point did you come into contact with the defendant, Young Moon?

A.    Yes, sir, I did.

Q.    How did that happen that you came in contact?

A.    My father was diagnosed with what the urologist termed garden variety prostate cancer in October of 2000 and had some surgery to reduce the size of his prostate.  Then was

1  set up with radiation therapy to begin in January of 2001

2  after he recovered from his surgery.

3        In December, my mother called and said that my

4  father was quite ill and I needed to come home.  So I took a

5  six-month leave of absence from my job to come home.  I am

6  the only child.  My mother and I took care of my father.

7        In January -- in December, he began to have lots

8  of clotting and lots of blood in his urine, and I was

9  extremely concerned that this did not appear to be the norm

10  for the people in the church that I had known who had gone

11  through prostate cancer, and so I began to push his urologist

12  as well as the staff at the hospital to do a chest x-ray

13  because that had never been done and that is standard

14  protocol in a hospital admission.

15        When he in fact received his chest x-ray, it was

16  noticed that he had nodules on his lungs.  They did a needle

17  biopsy there at the hospital in Crossville which showed that

18  he had nonsmall cell lung cancer, and his radiologic

19  oncologist immediately referred us to Dr. Moon, who was his

20  wife.

21  Q.    That was Dr. Lewis?

22  A.    Yes, sir.

23  Q.    Ma'am, what was your father's name?

24  A.    Alfred G. Smith.

25  Q.    When was it that Dr. Lewis referred your father to Dr.

1  Moon?

2  A.    In January of 2001.

3  Q.    And what course of treatment did Dr. Moon put your

4  father on?

5  A.    She put him on a course of treatment of Taxol and

6  Carboplatin and Procrit shots.

7  Q.    Were you present in Crossville when your father was

8  receiving his treatment?

9  A.    Yes, sir.

10 Q.    How would you say -- actually let me withdraw that for a

11 second.   Approximately how long was your father under the

12 defendant's care?

13 A.    From January of 2001 until May of 2001.   He passed away

14 on May 4th.

15 Q.    Were you there in the course of witnessing his

16 treatment?   How would you say he responded to his treatment?

17 A.    Miraculously well.   My mother and I were extremely

18 hopeful.   My father was extremely hopeful.   We typically

19 packed a cooler to take with us on the trip from Bledsoe

20 County to Dr. Moon's office.   He ate all the way up there and

21 drank water and juices all the way up there.   He typically

22 had a snack while he was there and then would send me out

23 toward the end of his treatment to retrieve whatever he

24 wanted for lunch on the way home, and that was generally

25 either a pizza from Pizza Hut with a vanilla milk shake or a

1  bag of Krystal hamburgers and a vanilla milk shake.

2          Then we would eat dinner when we got home.

3  Q.    How about with respect to any hair loss?

4  A.    He had no hair loss.  You need to understand that my

5  father was very proud of his hair, and so he was terrified of

6  losing his hair.  He had no hair loss and in fact grew a very

7  thick beautiful beard while he was on chemotherapy.

8  Q.    Ma'am, in the course of your work at the church and then

9  now at the medical office, can you frequently and do you

10  frequently come into contact with patients that are

11  undergoing chemotherapy?

12  A.    Every day.

13  Q.    More specifically, do you come in contact with patients

14  receiving Taxol?

15  A.    Every day.

16  Q.    How would you compare your father's side effects --

17          MS. THOMPSON:   Your Honor, I am going to object at

18  this point.  It is really sounding like medical testimony.

19          MR. WILLIAMSON:   She is drawing no conclusions,

20  Your Honor.  She is simply comparing what she's seen in

21  different patients receiving the same drugs.

22          THE COURT:   As long as she doesn't express an

23  opinion about medical causation, she can testify as to her

24  observations.

25  Q.    How would you compare the way your father responded to

1   Taxol to the way that other patients you have seen receiving

2   Taxol responded?

3   A.    Most of the patients that I see every day who are taking

4   a course of Taxol and Carboplatin have lost their nails up to

5   their nail beds.  They have no hair on their body period.

6   There are often violent reactions with nausea and vomiting

7   and diarrhea as well as abdominal cramping with these drugs.

8   My father experienced none of that.

9   Q.    Ma'am, how has your father's death affected your family?

10   A.    Well, I made a page of notes because I was afraid that

11   at this point I would lose my composure.  My mother and I

12   have both been on medication for clinical depression.  Since

13   we found out that in fact there was an investigation

14   regarding the treatment of these patients because if you have

15   ever experienced the death of a loved one particularly from a

16   damnable disease like cancer, it is hard enough to watch them

17   die.  You know, by the time my dad died, he was in so much

18   pain that we couldn't change the sheets under him if he

19   urinated on the sheets.  It hurt him too bad to be moved.  So

20   we just let him stay there for the day that it took for him

21   to die.  So you need to understand that.

22         You also need to understand that to then begin to

23   process that kind of death on top of the intentionality that

24   was behind the thought processes that brings a physician to

25   make a determination that the most vulnerable people in our

company aren't going to get appropriate treatment was devastating for me. I had spent my entire professional career either in social work or in ministry where I was called to make judgments every day about various kind of extremely difficult situations. I no longer trust my judgment. So I am no longer in the ministry, although I have continued with my ordination. I have not revoked my ordination. I work as an advocate for the working poor who come into our clinic seeking treatment and have no means to pay for it. I find a way for them to pay for their treatment. I question everything that I see going on there. I go to the board of directors if I see one misstep.

My daughters don't have a grandfather. We have two adopted children. The adoptions both took place after my father had died. We had hoped that at least we could buy him enough time with the chemo to see his eldest granddaughter who is now five years old. My mother had to sell her home because she is on a fixed income now of her Social Security which is a little over $900 a month. That doesn't go very far no matter where you live, so she lives with us now.

I have taken on supplemental jobs to supplement our income so that we can all live and buy groceries and have what we need and make a reasonable go at this. We buried three of our family members in six months from cancer, so I would hope that the people in this courtroom that can

1  understand the kind of anger and distrust and devastation
2  that we feel when we begin to understand that this did not
3  have to happen.
4  Q.    Ma'am, before we finish, is there anything you would
5  like to say to Judge Campbell with respect to the defendant's
6  sentencing?
7  A.    I would respectfully ask for maximum sentence.  I work
8  in around physicians every day who put their judgments on the
9  line every day.  I see people walk away who are cancer free.
10  I see people die from treatments that have not worked.  But
11  when medicine is motivated by greed, then I think we're in a
12  real serious state of affairs in this country.  And I would
13  ask particularly on behalf of the working poor who often
14  don't get the best treatment anyway who rely on TennCare and
15  Medicaid to pay their bills, I would ask on behalf of them
16  that you deliver a maximum sentence for this very intentional
17  process that has gone on that has cost the lives of people
18  whom we love.  I appreciate your listening.
19            THE COURT:  Thank you, ma'am.  Ms. Thompson.
20            MS. THOMPSON:  No questions, Your Honor.
21            THE COURT:  Thank you.
22            (Witness excused.)
23            MS. THOMPSON:  Can we approach the bench again?
24            THE COURT:  Yes.
25            (A bench conference was held as follows:)

1          MR. SIMMONS:  Your Honor, I think it is

2   inappropriate for the prosecution to solicit from these

3   people what their opinion is as to appropriate sentence.  We

4   have made our objection to it.  I think spontaneous when they

5   ask them if there is anything they'd like to address the

6   Court, you can note our objection, but I think it is

7   inappropriate to ask that question.

8          THE COURT:  I agree.  He didn't ask that question.

9   He asked is there anything else you want to say, and I think

10  that is appropriate question under Victims Rights Act.

11         MR. SIMMONS:  My understanding, notes reflect, Is

12  there anything else you'd like to say with respect to

13  sentencing?

14         MR. WILLIAMSON:  That's what we're here for.

15         THE COURT:  I don't think the question was

16  inappropriate.  I certainly don't want him to lead the

17  witnesses as to specific conclusions.

18         MR. SIMMONS:  If we could note our continuing

19  objection.

20         THE COURT:  It is noted.  And I guess the best way

21  I can say this is, you know, I am a big boy.  I am grown up.

22  I know how to apply the law and find the facts and know not

23  to be unduly swayed by emotional testimony, and I am going to

24  do what's appropriate.

25         MR. WILLIAMSON:  I would -- we only have one more.

1    MS. THOMPSON: Just want to make sure wouldn't be
2  cumulative.

3    MR. WILLIAMSON: Just one more.

4    MR. SIMMONS: Thank you.

5    THE COURT: You are welcome.

6    (Bench conference concluded.)

7    MR. WILLIAMSON: Your Honor, government calls
8  Linda Simpson Statham.

9                    LINDA STATHAM
10  was called, and being first duly sworn, was examined and
11  testified as follows:

12                 DIRECT EXAMINATION
13  BY MR. WILLIAMSON:

14  Q.    Good afternoon, Ms. Statham.  Ma'am, where do you live?

15  A.    I live in Alpharetta, Georgia, suburb of Atlanta.

16  Q.    Ma'am, how did you first learn of the defendant, Dr.
17  Moon?

18  A.    My brother, Jack Byron Simpson, was a patient of Moon's.
19  Jack was diagnosed with colon cancer in July of 2001.  He
20  immediately had surgery in Crossville, the Cumberland Medical
21  center.

22        Dr. Ivey, his doctor who did the surgery, I met
23  with right after the surgery, immediately after.  And Dr.
24  Ivey said, Well, Jack has a good prognosis.  He said, The
25  cancer has not gone to any other organs.  I would suggest

1  though that he contact Moon for a treatment of the cancer.

2  Q.    What in fact did your brother do?

3  A.    Pardon me?

4  Q.    What did he do in response to that advice?

5  A.    Oh, yes, he did start chemotherapy with Moon.  I refuse

6  to call her a doctor.  Moon.

7  Q.    And when approximately did your brother begin treatment

8  with the defendant?

9  A.    August 2001.

10  Q.    Ma'am, do you at your house in Alpharetta have your

11  brother's medical records?

12  A.    Yes, I do.

13  Q.    In preparation for this case, did you review his medical

14  records?

15  A.    I have reviewed his medical records.

16  Q.    And what was the primary chemotherapy drug that your

17  brother received?

18  A.    Jack received Camptosar.  He received Leucovorin and

19  Procrit.

20  Q.    Did he also to your knowledge receive a drug called 5FU?

21  A.    Yes, he did.  Yes.

22  Q.    In the course of your review of his records, is it

23  accurate to state that there were two separate -- actually

24  let me withdraw that for a second.  How long approximately

25  was your brother under the defendant's care?

1   A.    Approximately eight months.

2   Q.    During the course of his treatment with the defendant,

3   is it fair it to say there were two separate occasions when

4   he received his treatment of Camptosar, 5FU and Leucovorin

5   for seven straight weeks without a break?

6   A.    That's correct.

7   Q.    Did you have occasion during your brother's treatment to

8   observe the way he responded to these drugs?

9   A.    Yes, I did.  And if I wasn't here with Jack for or after

10  the treatments, Jack and I talked on the phone.  We were very

11  close.  We talked on the phone.  I would be the one he would

12  confide with the most.  And he would after each treatment he

13  would tell me how he felt.

14  Q.    How would you characterize the way that your brother

15  responded to the treatment?

16  A.    Well, it was so surprising because Jack was a very

17  slight person.  I would like to show a picture of Jack.  May

18  I?

19  Q.    You may.

20  A.    This is my brother, Jack Simpson.

21  Q.    Is that an accurate picture of your brother?

22  A.    Yes.  He was very small.  He only weighed 135 pounds

23  when he was well.  And when he was taking the treatments, he

24  didn't get very sick.  He did not lose his hair.  He was not

25  very nauseous.  I mean some, but not like I had been around

other patients.  My husband's mother had suffered from
cancer, and I had been with her.  I knew how patients
generally react to treatment.  Jack wasn't very nauseous, and
I remember thinking, my, this Moon lady must be doing a good
job that Jack is not getting very sick from his treatments,
so at the time I was so pleased.  It never, ever entered my
mind that he might not be getting his full treatment.  I feel
very guilty that I didn't question that.

Q.    Ma'am, you mentioned that your brother left the
defendant's treatment after a matter of months.  Why was it
that he left her treatment?

A.    Jack expressed to me several times that he was having
difficulty communicating with Moon not because of a language
barrier but because he when he would have concerns -- and let
me say that Jack was not one who would ask for extra
attention or demand a lot of extra attention.  But he
naturally had some concerns, and in particular I remember he
got a report back that the cancer had spread, that it was in
his liver and the cells had gotten larger.  He was very upset
about that.  And he called Moon.  Jack told me that Moon
said, Well, we -- come back.  Come back in two weeks, and
we'll talk about it.

Q.    And is that approximately at that point that he left her
care and chose another oncologist?

A.    It was shortly thereafter I believe, yes.

Q.    Ma'am, what effect has your brother's death had on your family?

A.    Oh, my goodness, tremendous effect.  Jack was not married so of course had no children.  He was very close to my children.  Uncle Jack.  Jack was a very kind man.  He was generous.  He didn't have much money, but he was very generous.  At the time, our mother was in a nursing home in Crossville.  Jack went every single day and visited our mother.  Jack had a very winsome way about him.  He was, as I said, he was small.  He just kind of hopped when he walked. He was a very happy person.  He had a wonderful will to live. Every day he'd pick up my mother's laundry, take it home, wash it, bring it back.  The nursing home always had beauty contests or just different contests.  Jack made sure that our mother had a new dress for every contest.  Every holiday, Easter, didn't matter what it was, Mom had a corsage that Jack brought for her.  He was just a wonderful son.  And he is a great loss.  He made everybody in that nursing home happy, not just my mother.  Everybody knew Jack because he was such a joy to be around, so not having Jack in our family is a tremendous loss to us.  He was a very loved person.

Q.    Is there anything about the specific circumstances of your brother's death and his having been in the defendant's care that has altered the way you and your family have dealt with his loss?

A.    Well, of course when you find out that very possibly treatment was diluted, that he didn't receive the correct dosage of treatment and that he more than likely died from that lack of the proper care, it causes one to question. Anger, yes.  I would say disappointment is very heavy in my heart.  I already mentioned I have a lot of guilt that I question why wasn't any of this caught, so. . .

Q.    Before we finish here, again would you like to to address the Court with respect to the hearing today?

A.    Yes, I would.  Thank you, Judge Campbell, first of all for listening to all of the testimony during all the trial. I want to thank the TBI individuals, all of the federal individuals who worked on this case.  I thank you so much for bringing this forth and bringing this to the public's eye because it should not go on.  You know, our loss of Jack is one thing, but if this type of thing continues, the hundreds of families that might be affected, it would be devastating.

      Do you mind if I just read one little paragraph that I wrote concerning this loss?  I said, When one loses a family member or a friend through a natural death or even a dreaded accident, it is always difficult to accept.  Even though those of us who are Christians know we will see that person again, and thank goodness for that.  However, to lose someone dear through the purposeful intentions such as were demonstrated by Moon makes it much more difficult to accept.

Jack died, I feel, because he was murdered.  It is a terrible
thing.  It is a terrible thing to even accuse somebody of
that.  I feel strongly about that.  He wasn't shot.  He
wasn't stabbed.  He was denied the opportunity to live a full
life due to Moon's greedy ways.  If a doctor makes an honest
mistake and mistreats a patient, that's one thing.  I can
understand that, an honest mistake, but to purposely,
purposely deny somebody the treatment that that person
deserves is unacceptable.  It never should have happened.

          I would ask that you consider Jack and all of the
other patients and their families who were so affected by
this selfish, greedy person.  She is a disgrace to the
medical profession.  She is a disgrace to humanity.  She
deserves the same mercy that she gave the people she gave
treatment to.

          Jack and others did not deserve to die.  My
brother, Jack, had the most wonderful outlook.  Anybody who
knew Jack always commented on the fact that Jack had this
huge will to live, and he did.  I am going to fight this.  I
am going to beat this.  Don't you worry.  No, Linda.

          And he did.  He thought that he did.  And I
thought he would make it too.  And I think -- I know with the
right treatment he would have made it.  And I think that my
message would be he didn't deserve this.  He was kind.  He
was a wonderful man.  He never, ever that I know of ever hurt

1  anybody.

2        He was 54 when he died.  That's not very old.  He

3  didn't deserve to die.  And I would ask, please, Judge

4  Campbell, think about all of these people.  Think about Jack.

5  I brought this picture in particular because Jack told our

6  neighbor that this was always his favorite picture, and I

7  appreciated that because I was very close to my brother.

8  Q.    Thank you, ma'am.

9  A.    Thank you.

10        THE COURT:  Ms. Thompson, any questions?

11        MS. THOMPSON:  No, Your Honor.

12        THE COURT:  Thank you, ma'am.  Appreciate you

13  coming.

14        (Witness excused.)

15        THE COURT:  Mr. Williamson, any further proof on

16  behalf of the government?

17        MR. WILLIAMSON:  That's all the proof from the

18  government.

19        THE COURT:  Ms. Thompson, would you like to

20  introduce any proof?

21        MS. THOMPSON:  Yes, Your Honor I'd like to recall

22  the woman from the TBI.

23        THE COURT:  All right.  I guess that's Ms.

24  Matheny.

25

                          SHARON MATHENY

1

2    was recalled, and having been previously sworn and remaining

3    under oath, was examined and testified as follows:

4              THE COURT:  You can be seated in the witness

5    chair.  You are still under oath.

6                        DIRECT EXAMINATION

7    BY MS. THOMPSON:

8    Q.    I am not a math person, but I wanted to ask you about

9    these numbers.  You said that it did not matter what the

10   individual dose was charged as to what the total loss would

11   have been; is that correct?  Was that your testimony?

12   A.    Which exhibit?  And may I have it back before me?

13   Q.    Yes.  I am looking at Exhibit 1.

14   A.    Would you reask the question.

15   Q.    What you said was let's take first the line here, the

16   Medicare line was $1,148,262.02.  That's multiplied by a

17   fraud rate of 48.939; is that correct?

18   A.    Yes.

19   Q.    Okay.  But if the amount that you paid per dose or the

20   amount that you billed per dose changed over time and the

21   fraud rate is not consistent, then the amount of loss could

22   be manipulated?

23   A.    The fraud rate is determined at the end of the

24   indictment period using the total of each individual billing

25   per patient, so a patient may have had 50 bills , a hundred

1  bills.  They are billed at whatever she billed at that time.

2  I am not -- I have no way of determining how she, Dr. Moon,

3  determined what to bill.  All I know is I have a schedule of

4  billing individual bills per patient that is what this

5  spreadsheet summary is based on.

6  Q.    Okay.  Let me give you an example.  Work with me on this

7  if you would, please, and help me understand if the loss can

8  be manipulated.  Let's say in one year you bill for five

9  doses of medication.  You actually gave five doses of

10  medication.  And that medication costs one dollar per dose.

11  That would be a total amount billed of five dollars.  Five

12  billed, one dollar per dose total amount billed at five

13  dollars.

14        If the next year the price increases

15  substantially, billed for five doses, it was a hundred

16  dollars per dose, you gave zero doses, you would have billed

17  for five hundred dollars.  Five doses times a hundred dollars

18  equals five hundred dollars.  Total if you summed that up you

19  would have billed for ten doses.  It would be a 50 percent

20  fraud because the first year you got your five doses, the

21  second year you got zero doses, so you only gave five doses

22  out of ten billed.  That's 50 percent fraud, and the total

23  cost would be $505 that you billed for.

24        If you multiply $505 by 50 percent, you would get

25  a total fraud rate of $252.50.

1  A.    I have no idea.  I don't have a calculator up here or a
2  piece of paper to do it with.
3  Q.    Can we get you a piece of paper, or can I get you a
4  calculator?
5  A.    Both would be nice.
6  Q.    So my problem that I --
7  A.    Hold on one second.  I am setting up a spreadsheet.  So
8  you said year one you had five doses at a dollar a dose,
9  total billing five dollars.
10  Q.    And you --
11  A.    That was actually given to the patient?
12  Q.    Yes.
13  A.    Year two you have five doses at a hundred dollars per
14  dose.  None of that was given.
15  Q.    Right.
16  A.    In my calculations if you have that then your fraud rate
17  would be 99.1 percent based on total bills.
18  Q.    Based on total bills.  How do you get 99.1 percent?
19  A.    You said you had five doses at one dollar a dose.  Do
20  you want me to write it up here?
21  Q.    Sure.
22  A.    May I step down?
23        THE COURT:  Yes, ma'am.  Just be careful.
24        THE WITNESS:  So year one you had five doses at a
25  dollar a dose.  That is the total of $5.  And then year two

you had five doses at a hundred dollars a dose.  That's $500.
So your total for both years is $505.

Your $5 from year one is okay, but your $500 from
year two is fraud.  So then you divide your total fraud which
is $500 times your total billed, which is $505, so your fraud
rate would be .990099 which is 99.1 percent.

BY MS. THOMPSON:

Q.    Okay.  So that is not how you did the problem though in
the case?

A.    Because it is a different scenario.

Q.    Right.

A.    The way I did this problem is I took a fraud percentage
rate from the trial.

Q.    So what's the fraud percentage rate?  Let's say you
didn't -- the fraud percentage rate could be manipulated
here?

A.    No.

Q.    You could say it is a 50 percent fraud?

A.    No, ma'am, it is a hundred -- it is a 99.1 percent fraud
because you are not doing it on doses.  It is not based on
doses.  If so, then this would be this first column would be
number of doses during indictment period.

Q.    Right.

A.    And it is not that.  It is the total amount billed so it
is a different whole different.  It is apples and oranges.

1  Q.     So how do you get the fraud?  You said that came from

2  the trial.  I want to know where that number 48 percent came

3  from.

4  A.     Hold on.  Let me get my stuff out.

5               THE WITNESS:  May I step up also.

6               THE COURT:  Yes, ma'am.  Just be careful stepping

7  up, ma'am.

8               THE WITNESS:  Yes, sir.

9               Bob Turner prepared a schedule or what I would

10  call a spreadsheet for the trial for Taxol, Onxol for the

11  indictment period.

12  BY MS. THOMPSON:

13  Q.     Yes.

14  A.     It is Exhibit 1.3, U.S. 5950.  And he also prepared the

15  Exhibit 1.0.

16               If you take and we want -- excuse me, during the

17  trial it was brought out that we wanted to show the -- give

18  her the benefit for the overfill in the vials so we

19  calculated the fraud percentage rate taking into

20  consideration the overfill.  So the total drugs purchased for

21  Onxol -- I am sorry, this is a little bit unwieldy.  Okay.

22               The drugs purchased, including the overfill, was

23  obtained off of U.S. 5978.

24               THE WITNESS:  May I use your --

25               THE COURT:  Go right ahead.

1       THE WITNESS:  And that is Exhibit 1.6 on the
2   Taxol.  It is the invoice purchases overfill table.
3           So we had all of her invoices, all of Dr. Moon's
4   invoices from her office, and then we also in trial it was
5   brought out that we double checked that with the invoices
6   from the individual drug companies.  And the total amount
7   including the overfill was determined to be 54,217 in
8   milligrams.  And the drugs administered which is off of
9   Exhibit 1.3 dosage charted for the indictment period, the
10  total dosage amount charted was 106,181,000.  I do not
11  remember if this is in millions or thousands, but anyway, one
12  way or the other.  When you take the difference between the
13  total amount purchased plus the total amount of drugs
14  purportedly administered, the difference is 51,964.
15          When you take the difference and divide it by the
16  total administered, you get a fraud percentage rate of 48.939
17  percent.
18  BY MS. THOMPSON:
19  Q.    Okay.  So what you are saying instead of worrying about
20  milligrams or whatever, we're just saying units, okay.  So
21  what you did was over the whole all of the years involved --
22  A.    Indictment period.
23  Q.    Indictment period you did a summary, okay.  And from
24  that summary, you say your top number is going to be the
25  amount that she bought?

1  A.    Total amount purchased, yes.

2  Q.    Total amount purchased from the drug companies, and

3  that's the 106 number?

4  A.    No, total purchases 54,217.

5  Q.    Fifty-four.  And the total amount that she billed for

6  over all of the time periods is that 106,181?

7  A.    It is the total dosage amount charted on Bob Turner's

8  schedule.

9  Q.    So you took the amount that she actually purchased, you

10 put it over the amount that she billed for, and you got a

11 percentage, a fraud percentage, right?

12 A.    No, I took the total amount purchased, subtracted --

13 well, the total drugs administered, subtracted from what she

14 purchased.  This is the amount that was said to be

15 administered that was not in the inventory.

16 Q.    Okay.

17 A.    That is the difference.  And I put that over the total

18 administered to get -- Bob Turner put it over, and I verified

19 it.  That's all I did was verify.

20 Q.    Taking the same scenario, let's go back to my scenario

21 that we just did where we come up with what my fraud is.  If

22 we are -- if according to my scenario I gave you before the

23 total amount purchased is -- let me just review for the

24 record.  I said that the first year I billed for five, I

25 actually administered five, and the price was a dollar unit.

1  The second year I billed for five, I administered zero, and
2  the price was a hundred dollars per unit. So my total then
3  would be I billed for ten, I actually purchased and
4  administered five.
5  A.    That's not comparable to that.
6  Q.    It is.
7  A.    No, ma'am, it is not.
8  Q.    Why?
9  A.    Because billed and administered is different than
10 purchased and administered.
11 Q.    Then let me change my scenario. Let me say I purchased
12 and administered. The first year I purchased and
13 administered five. The second year I purchased and
14 administered zero but billed for five. So I have a total of
15 billed for ten but in actual purchase and administered of
16 only five.
17 A.    That's not comparable to this because the 48.939 percent
18 was determined during trial based on the total amount
19 purchased for the period. Hold on. Excuse me, I made a
20 mistake. The percentage rate was based on --
21 Q.    It is that formula you just wrote up there.
22 A.    I know, please. I just need a second. We're changing
23 between apples and oranges, and I have got to get it straight
24 before I make a statement.
25         Okay. Purchased you are saying you administered

1  five.

2  Q.    I am saying I administered five.

3  A.    You say you purchased and administered five on year

4  one?

5  Q.    Right.  I purchased and --

6  A.    And administered five doses on year one.  You purchased

7  and administered zero doses on year two.  You billed for ten

8  doses.

9  Q.    Yes.  But I want you to use the totals.  I don't want

10  you to use year by year.  I want you to use the totals.

11  A.    So your percentage rate based on purchases and

12  administered dosage, not bills doses, total doses.

13  Q.    For the year I mean for the two years, I want you to

14  come up with a two-year summary.

15  A.    For doses or bills?

16  Q.    I want you to do it just like you did up here.  That top

17  number, you said that's the purchase and administered.

18  Explain to me --

19  A.    No, I said that was drugs purportedly administered from

20  her chart.

21  Q.    Okay.

22  A.    I don't know what was actually administered because I

23  wasn't there.  That's drugs purportedly administered from her

24  chart.

25  Q.    Okay.

1  A.     And that was determined in trial.

2  Q.     Then let me set up my scenario.  Let's say there's been

3  a trial.  At trial I was found guilty of purportedly

4  administering in the first year five doses, and I actually

5  purchased five doses.  The second year I purportedly

6  administered five doses.  I purchased zero doses.  What is my

7  fraud percentage rate for two years total?

8  A.     Okay.  Fifty percent.

9  Q.     Fifty percent.  Okay.

10  A.     Based on doses.

11  Q.     Based on doses.  If I take that 50 percent right like

12  you did here, I multiply that by the total amount of money I

13  received.

14  A.     That was what was done in trial based on the money that

15  was --

16  Q.     Okay.  So if I received a total amount of money of

17  $505 --

18  A.     That's what you actually were paid.

19  Q.     Right.

20  A.     $505.

21  Q.     I was actually paid $505 total.

22  A.     Okay.

23  Q.     How much of that is loss?  How much of that is fraud?

24  A.     $252.50.

25  Q.     Okay.  But we know in actuality that first year the

1 doses I bought and actually gave I only paid a dollar each

2 for them, and so I only paid five dollars.

3 A.    I didn't do calculation.

4 Q.    This is part of the scenario.

5 A.    I verified his spreadsheet figures.

6 Q.    I am asking you as part of the scenario, please work

7 with me, if the first year I billed for five doses, I

8 actually administered five doses and they were a dollar a

9 dose, total amount then is five dollars.  And that five

10 dollars was actually given to the patient.  If the second

11 year was when all my fraud was committed, if all fraud

12 occurred in the second year when the price went way up to a

13 hundred dollars per dose, $500 of that total amount is fraud;

14 is that correct?

15 A.    Yes.

16 Q.    So it is very important how much you paid per dose and

17 when it was purchased.

18 A.    I have no idea.

19 Q.    In my scenario I listed, you said it was $252.50 of

20 fraud, but that's an estimation and that's not an exact

21 amount.

22 A.    You would have to -- to get an exact amount, you'd have

23 to be in the office, know what was exactly given, know what

24 was exactly purchased, know what was exactly paid at what

25 date, which patient, which billing.  And you would have to

determine individual line items how much fraud.  If you knew,
if you were a mind reader and you knew how much was actually
given to that one patient on January 1st of 2000, what was
actually paid to her on for that billing, what she billed,
what she was paid, you'd have to do it for each patient for
each individual day to get an actual fraud loss.  And you
would have to be in the office and know what was actually
given and what was actually purchased, and I don't know that
because I wasn't in the office.  All I did in this case was
take Bob Turner's spreadsheets, verify his figures using the
spreadsheets that were already opined upon in the court case
and determined to be correct and determined to be accurate
and brought those figures forward to determine that his
summary sheets are correct, and that is my opinion.  They are
correct.

Q.    I can manipulate these numbers in another way.  If I say
in the first year I billed for five doses, I got zero doses,
a dollar a dose, that's five dollars worth of fraud.

A.    What do you mean you got zero doses?

Q.    Administered.  In actuality gave patients zero doses.
If in the first year I billed for five doses.

A.    You can do anything with these two years, but --

Q.    But I could make the fraud be either five dollars worth
of fraud or $500 worth of fraud, depending on how I
manipulate these numbers?

A.    In this instance, yes, but when we determined that a
percentage is accurate from the trial, we know that the fraud
rate determined by the trial is 48.939 percent, I can
legitimately take that forward or Bob Turner can.  He did the
spreadsheets.

Q.    But that's an average?

A.    And I can determine.

Q.    Would you agree with me?

A.    It is a percentage.

Q.    It is a percentage and an average; it is not an actual
loss?

A.    It is not an average.  Nobody knows what the actual loss
is.  I don't know because I wasn't at the office.

Q.    Would you agree with me that depending on what you are
reimbursed and what you bill for Medicaid, TennCare and Blue
Cross Blue Shield that the numbers would change also?  I mean
I could manipulate this loss formula here by changing the
different percentage rates depending on what --

A.    No.

Q.    Are you saying no?

A.    I am saying no, because I am saying --

Q.    Should we go through this?

A.    Hold on.  Let me finish my statement if I can.  What I
say no to is if you determine -- if you change Exhibit 1,
page one, from this that I have in front of me, if you change

Medicare to two million something and apply our fraud

percentage to it, yes, you are going to get a larger amount

of intended loss.  Yes.  That I will agree to.

But I will not agree that the fraud percentage is

not correct because based on the spreadsheets from the trial,

that is a correct figure determined by the difference from

what she purportedly administered and what we know she

actually purchased from the drug companies from their records

and her records also.

Q.    You cannot use fraud percentage to determine the actual

loss?

A.    We're not determining the actual loss here.  We're

determining the intended fraud loss based on what the actual

fraud percent was.

Q.    You can't determine the intended loss?

A.    Excuse me, may I --

MR. WILLIAMSON:  Could she let the witness finish

her sentence?

THE COURT:  You can finish your statement.

THE WITNESS:  May I start over?

THE COURT:  Yes.

THE WITNESS:  This is not trying to determine the

actual fraud loss because I can't determine that because I

wasn't in that office giving the medication, so I don't know

what was actually given to who.  The drugs that were

purportedly given that she charted, Dr. Moon charted, less
the drugs that were purchased from the drug company which we
got her invoices -- excuse me, Bob Turner got her invoices
and Andy Corbitt. Plus they also obtained the same invoices
from the individual drug companies. That is how he
determined the percentage rate.

This has nothing to do with actual fraud. This
is, as the summary shows, it is intended fraud. It is
purported -- it is taking the fraud percentage that was
determined in the trial, multiplying it by what was actually
the total that was actually billed from what we have from the
companies, and that is the amount of the intended fraud loss.
This is not coming up with an actual fraud loss because I
can't determine that. I wasn't there.

MS. THOMPSON: Your Honor, may I have a minute?

THE COURT: Yes.

BY MS. THOMPSON:

Q. Let me ask you another question. Do you know anything
at all about insurance and the fact that doctors have a
certain amount of write-offs that they get when they have
contracts with insurance companies?

A. Are you when you say write-offs, are you saying now I am
speaking from my private insurance with Blue Cross Blue
Shield, I know that when my doctor in Murfreesboro bills Blue
Cross Blue Shield for an $80 doctor visit, he has I guess

negotiated a contract that he says he will accept $20, and so

he has an adjustment of some kind that shows on my EOB, my

Explanation of Benefits.  It will show $80 visit with the

doctor.  It will show an adjustment.  It says adjustment and

then a --

Q.     Network savings?

A.     Of $60.  And then it will show the doctor's visit is $20

and that's what he has accepted for this visit of let's say a

99201, which is a short visit.  And then my insurance company

pays 80 percent, which is $16, and then four dollars I will

send them.  That's all I know because I don't work for an

insurance company.  I work for Tennessee Bureau of

Investigation.  I have never worked for one, and that's not a

part of my job.  I am an auditor, not an insurance agent.

Q.     So you didn't take into account here any information

about what would have been the -- you just took the original

billed amount, correct?

A.     Bob Turner prepared these, so he took the original

billed amount.

Q.     You didn't know what the discount would have been as --

A.     Then he took the next column over is the dollars paid,

and, no, I don't -- I have no idea if he knows, but the

spreadsheet doesn't take the adjustments because that

wouldn't really affect the computations because -- I am

sorry.

         MS. THOMPSON:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. WILLIAMSON:

Q.    Ms. Matheny, how are you?

A.    Just fine, thank you.

Q.    The calculations Special Agent Turner did was you looked

at how much Dr. Moon had purchased of these drugs and how

much she claimed she had given patients of these drugs,

right?

A.    Yes, sir.

Q.    And then he divided, used those numbers to figure out

exactly how what percentage of those drugs that she claimed

she had given she had actually given, right?

A.    Yes, sir.

Q.    And then he multiplied that number by the amount that

she asked insurance companies, including Medicare and

TennCare, to reimburse her for the drugs that she claimed she

had given to patients but hadn't actually given patients,

right?

A.    The total amount billed, yes, sir.

Q.    Total amount billed over this two-and-a-half-year period

for Taxol and Camptosar, correct?

A.    Yes, sir.

Q.    Do you have in front of you there how much the

reimbursements decreased over that period?

1   A.     No, sir.

2   Q.     Ms. Thompson's example she increased the payment

3   schedule one hundred times over one-year period. Have you

4   ever encountered an increased payment of a hundred times over

5   a period?

6   A.     No. I was looking at this previously, and I had said,

7   you know, the one patient was billed at $2400 for six units,

8   and then they got seven units for $2800 so, no, I don't see

9   any hundred percent variation.

10   Q.     Sometimes there are small increases year to year in how

11   much insurance companies pay for certain services, right,

12   small increases?

13   A.     I am sure there are, yes. From the looks of this

14   schedule, yes.

15   Q.     Okay. Now, the total loss number or total intended loss

16   number that Special Agent Turner calculated and you verified

17   is 1.295 million dollars, right?

18   A.     Hold on. Let me look. I am sorry. It is $1,295,653 of

19   intended fraud loss.

20   Q.     Okay. Assume for a moment that an important figure in

21   calculating the defendant's sentence is whether the loss was

22   more than one million dollars or the intended loss was more

23   than one million dollars. Is there any reason you can think

24   of --

25          MS. THOMPSON: Your Honor, I am not sure what kind

1　of opinion she is going to be qualified to give on this

2　matter.  She's already said that she didn't know what the

3　amounts were.

4　　　　　THE COURT:  Ask your question, and then we'll

5　argue about it.

6　BY MR. WILLIAMSON:

7　Q.　Is there any reason you can think of, Ms. Matheny, why

8　that 1.295 million dollar loss number would be off by 30

9　percent such that the actual intended loss would be under one

10　million dollars?

11　　　　　MS. THOMPSON:  Your Honor, I object.

12　　　　　THE COURT:  Overruled.  Go ahead.

13　　　　　THE WITNESS:  May I do something on a

14　calculator?

15　BY MR. WILLIAMSON:

16　Q.　Have at it.

17　A.　No.

18　Q.　Okay.

19　　　　　MR. WILLIAMSON:  Thank you, Your Honor.

20　　　　　THE COURT:  Anything else from this witness?

21　　　　　MS. THOMPSON:  No, Your Honor.

22　　　　　THE COURT:  Thank you, ma'am.

23　　　　　(Witness excused.)

24　　　　　THE COURT:  Ms. Thompson, would you like to call

25　another witness?

1    MS. THOMPSON:   No other witnesses, Your Honor.
2  Thank you.

3         THE COURT:   All right.   Does the government want
4  to summarize its position about the objections?  I need to
5  rule on those and then set the advisory guideline range.

6         MS. McINTYRE:   Yes, please.   Thank you, sir.   Of
7  course the base offense level in this case is six under
8  2B1.1.   The first enhancement is for a loss over one million
9  dollars, which adds 16 points pursuant to 2B1.1(b)(1)(i).   We
10  think that the evidence from Ms. Matheny and the exhibits
11  introduced in this case clearly show that there is an
12  intended loss of over one million dollars.   And in this case
13  the billed amount is synonymous with intended loss; hence,
14  that is the figure that counts for that enhancement.

15         Next, the next enhancement is that the offense
16  involved ten or more victims pursuant to 2B1.1(b)(2)(A).
17  That adds two points.   The definition of victims for purposes
18  of that particular enhancement includes people who either had
19  actual bodily injury or had economic injury.   In this case,
20  the United States is contending that people who had, or,
21  excuse me, the entities which had economic injury, economic
22  loss are the ten or more victims under that particular
23  section.

24         And again Ms. Matheny testified and the exhibits
25  verified that there were 15 private other insurance company

victims.  And of course we also know from the trial that
there was Medicare, TennCare and private Blue Cross Blue
Shield.  That means that there were 18 different entities
that suffered from economic loss, and that enhancement should
apply.

The next enhancement is for sophisticated means
under 2B1.1(b)(9)(C), and that adds two points.  The reason
why this applies is because the defendant used her skills as
a doctor to convince her nurses to carry out her instructions
for Procrit and also to allow her to mix chemotherapy herself
in order to hide her diluting of those chemotherapy drugs.
That is a very sophisticated method of carrying out the
healthcare fraud scheme, and that was why that enhancement
should apply.

The next enhancement is for the risk of death or
serious bodily injury under 2B1.1(b)(12)(A), and that adds
two points.  The testimony of Dr. Rothenberg clearly showed
that there is a risk of death when you give cancer patients
less medicine than either your treatment plan calls for or
you have told the patient that they are going to be getting.
Moreover, we would simply add that under any common sense
analysis, whether we have an expert testifying about it or
not, that when one gives a cancer patient less chemotherapy
drugs, which is of course a life-preserving treatment, then
there is necessarily a conscious and reckless risk of

injuring that person.  That is a very serious thing, and that
is exactly what this particular enhancement should be applied
to.

Next, the defendant should get the enhancement for
having known that a victim was a vulnerable victim.  That's
under 3A1.1(b)(1), and that adds two points.  There has been
a lot of talk by the defense counsel about what victims are,
and of course victim has a different definition for each of
these enhancements.  For this particular enhancement, the
definition of a victim is one who is unusually vulnerable due
to age, mental or physical condition.  And of course I think
there could be hardly any clearer example of vulnerable
victim than someone who was a cancer patient and is showing
up for life-saving treatment from her doctor.  That kind of
patient is clearly incredibly vulnerable in every sense of
the word.  She certainly here she certainly would be
physically vulnerable, and of course many of these patients
were elderly as well, making them vulnerable due to their
age.

The next enhancement is that there is a large
number of vulnerable victims under 3A 1.1(b)(2).

Now, we also presented evidence through Ms.
Matheny about the number of vulnerable victims in this case.
We recognize that it is impossible for us to say exactly who
got how much Taxol or Camptosar aside from the specific

evidence presented through Dr. Rothenberg and the testimony
regarding Sheila Taylor and Billy Jones because there was
specific testimony at trial about those folks. But it is
clear through the aggregate testimony shown at trial and
through the jury's verdict that the defendant only gave about
half as much Taxol as she billed for and only about
two-thirds as much Camptosar as she billed for. It is a fair
inference to look at the field of Taxol and Camptosar
patients as a whole and to say that they are all victims of
the defendant's conduct because there is no way for them to
individually know who got what. And, therefore, having seen
both the letters and the testimony that you have seen from
patients and their family members, these people necessarily
never will know for a fact how much of that medicine they
got, and they will always feel approximate injury from the
defendant's conduct, an uncertainty.

    Now, in order to get a more precise calculation in
the event the Court wishes to consider that the United States
still applied what we thought was the most -- was a rubric
that gave the defendant the highest possible benefit of the
doubt in the event that the Court doesn't wish to consider
every single Taxol and Camptosar patient a victim. Now, that
is the testimony that you heard from Ms. Matheny. Even if
you give the defendant the benefit of the doubt and assume
that the patients who Dr. Rothenberg thought got partial

doses actually got zilch, got no doses whatsoever of those
chemotherapy drugs and you assume the same thing about Sheila
Taylor and Billy Jones and then you look at the people who
got the highest doses and assume that they got none, then you
still end up with 75 victims in this case. That would of
course include based on the trial testimony that Procrit
patient always got partial doses, evidence that the Procrit
patients were all victims, and of course there were 69 of
those.

     Ms. Matheny meticulously went through and
established that we did not double count Procrit, Taxol or
Camptosar patients in any of that compilation in which we
come up with 75 victims. I think the law is clear that 75
victims constitutes a large number of vulnerable victims.
And that enhancement should certainly apply.

     Next, we would note that the abuse of position of
trust or special skill enhancement also applies. And that is
under 3D1.3, and she receives two additional points for that.

     In this case, the defendant had a special trust, a
special skill and also a position of trust in that she was a
doctor. She also had managerial discretion because she
operated a solo practice in which she was not questioned
really in essence by her employees. She abused both her
position of trust, her special skill -- I guess it was three
things -- and her managerial discretion by using them to

commit healthcare fraud and to further perpetrate her scheme.

Finally, the last enhancement is for obstruction of justice under 3C.1. Now, that enhancement applies because for two years. The defendant committed perjury at trial. She did this in three ways. She stated, and we can produce the transcript if there is any uncertainty about this, but she testified when she took the stand that she never intentionally billed chemotherapy drugs in amounts not administered to patients.

Furthermore, she said that she never told a nurse to chart ahead the amounts of medicines that were administered before those amounts were actually given.

And then finally under this prong she said that on January 9th of 2002 when the agent came and interviewed her that she truthfully answered their questions. Now, there was ample evidence at the trial showing that all three of those points were false, and of course they were materially false. They were all significant points about the fraud that she lied about.

The second way in which she committed obstruction of justice is by giving the material false statements and to the law enforcement agents during that interview as reflected in her conviction for Section 1001.

We would only note in addition to that computation, which adds up to 36 leaving her with a range of

1  188 to 235 months, that there was an issue about whether a

2  fine should apply in this case.  The United States certainly

3  believes that a fine within the guideline range is

4  appropriate here.  Not only has there been testimony about

5  the defendant's greed, but in the probation report I think it

6  is quite clear that the defendant has ample resources to pay

7  a fine and that in this case there is absolutely no reason to

8  depart from that guidelines recommendation by not giving her

9  a fine.

10              We thank you for considering these points.

11              THE COURT:  Ms. Thompson.

12              MS. THOMPSON:  Your Honor, I would first address

13  the amount of loss.  I am going to go by my presentence

14  report here.

15              THE COURT:  Okay.

16              MS. THOMPSON:  I would first address the fact that

17  the victim impact I still would argue that there are only

18  three victims in this case and that there were three

19  healthcare providers that were listed on the indictment.  And

20  I do object to any other people being listed as victims.  I

21  think in this matter these things happened from up until

22  January of 2002, and at that time, Your Honor, the law was

23  still that was in effect was Apprendi, and I would state as

24  being preBooker.  We could when this happened if there is an

25  ex post facto argument in this matter that the sentencing

cannot be now changed or altered by Booker in allowing
enhancements that are not specific to the indictment, and so
I would argue that in this case there are only three
healthcare providers.  There are only three victims and that
the other healthcare providers, these 15 others that they
listed that were not in the indictment cannot be used for
enhancement purposes, and I would certainly say that there's
not been proof to those.  I would also say that in this
matter I mean we've heard some very emotional testimony.  I
can certainly understand people being emotional.  I myself
lost my mother to cancer.  But none of these people provided
any information that the loved ones that they lost were in
fact due to any type of dosage or medication that Dr. Moon
did or did not give to them.  Certainly the woman with the
ovarian cancer had cancer third stage ovarian cancer.  The
other person had lung cancer.  I think those are all very
serious matters, so we haven't heard any specific information
here today that would list them as a victim and that there is
no evidence that they suffered any direct harm.

Furthermore, Your Honor, I would say that the
doctor said yes, there are protocols that they use with their
clinical trials but that there are deviations from those
protocols.  He was not able to say with any certainty or
percentage that if you deviate so much this then causes the
specific harm, so I would say that even the doctor's

testimony failed, fell far short of being able to show that
these people had received any specific harm.

Next I would address under the loss amount, Your
Honor, the government has failed to prove that the amount of
loss is over a million dollars for item I.  The government
says that they can take these numbers and just multiply them
by a percentage and just come out with the amount of loss.
But it really does matter as to which people received a
shortage how much they were billed because TennCare would be
billed a different amount than Blue Cross Blue Shield, and it
would depend on which person individually did or did not
receive a dosage.  The government just averaged it out, but
because it has a specific effect on the sentence, I would
argue, Your Honor, that the government can't just come up
with an average loss like they did.

I think I was able to demonstrate clearly that if
you manipulated the numbers, if you were charging for
different amounts that it would change the outcome.

THE COURT:  What amount do you contend is the
amount of the intended loss?

MS. THOMPSON:  Your Honor, I would contend that it
is under a million dollars.  I don't contend that it is any
specific amount, but I'd say it cannot be proven that it is
up to a million dollars, and I would certainly say, Your
Honor, that if we took out the amount that they put in for

these 15 insurance companies that are not included, then you get your number down to a number that could be manipulated by different percentages by a cost of, you know, an increase in inflation. That number could be manipulated to above or below a million dollars, so I would say that that plus the additional thing that the government did not address is the fact that the amount of loss under the definition of the amount of loss in the comments, people are given credit for any type of fair market value under E, subsection E1. You get credit for fair market value of services rendered. And I would say that just because you bill for a million dollars worth of services that everybody understands that the way billing works is there is a certain percentage that is discounted through a contract that you have in order to for using in-network providers. And the government didn't even address that at all, that there is a certain amount here that may have been easily written off.

So just because a doctor sends in a bill for any kind of services on your EOB for the amount, that's not what the doctor would even expect to get back. And it is not the true amount that they are billing for because they already have a contract and they understand that when they bill for a hundred dollars, they may only get $40 recognizes the cost of service. And the government did not even address that, so I'd say that their number is just completely wrong.

1        Next on the obstruction of justice charge, Your

2 Honor.  We would state that the government had claimed that

3 the conduct and her statements made to investigators impeded

4 justice, but there are no charges of any fraud that occurred

5 after January 9th, 2002, so what she did or did not say to

6 investigators does not affect in any way the amount of fraud

7 that was occurring or she was convicted of.

8        Next I would say that we object to the -- again we

9 object to paragraph 33 to the characterizations of victims

10 where they have listed more victims than the indictment.

11        The government points to the fact that the

12 defendant used her skill as a doctor to manipulate the

13 nurses.  I would say, Your Honor, that is not any special

14 skill.  That if you use -- if the jury found that she had

15 instructed nurses to change doses, that that's not a special

16 skill.  That's just -- so it wouldn't be something that -- I

17 mean, that would be something anybody could do.

18        Again we say that there is no evidence that there

19 is any risk of serious bodily injury under paragraph 35.  And

20 the doctor again was not able to say that what percentage of

21 persons would be injured or not injured.  These people were

22 seriously ill to begin with.

23        That's -- I did have some other objections, Your

24 Honor, to the voluntary surrender and special conditions, but

25 I think the Court is going to take that up after it

1　determines --

2　　　　　THE COURT:　Yes.　Have you withdrawn the objection

3　dealing with voluntary surrender?

4　　　　　MS. THOMPSON:　No, we haven't.　As of now, no,

5　Your Honor, we have not withdrawn our objection to voluntary

6　surrender.

7　　　　　THE COURT:　Okay.

8　　　　　MS. THOMPSON:　So I'd like to be heard on that in

9　a minute.

10　　　　　THE COURT:　All right.

11　　　　　MS. THOMPSON:　Any objections I didn't

12　specifically address, I stand on my brief.

13　　　　　THE COURT:　I have reviewed it.　It is at Docket

14　Entry 269.

15　　　　　I am going to make the following rulings regarding

16　the objections.　I am going to start with the objections that

17　deal specifically with the offense level computations.　First

18　one is the defendant's objection to the intended loss

19　calculation.　The Court overrules that objection, and I am

20　crediting the testimony of Ms. Matheny and the Exhibit 1 that

21　was introduced by the government and finding that the

22　intended loss was in excess of a million dollars,

23　specifically based on that exhibit $1,295,653.

24　　　　　On the objection -- let me back up.　That's

25　paragraph 32.　We start with a base offense level at

paragraph 31 of six to which there is no objection.

Paragraph 32, there was an objection of the 16-level enhancement based on the intended loss, and I am overruling that objection for the reasons stated.

Then there is an objection to paragraph 33 dealing with ten or more victims. I am overruling that objection. There are three listed in the indictment. There were 15 additional private insurance company victims that are in the Exhibit 2 introduced here at sentencing. And then there are the patient victims which are approximately 75 individuals, and that totals more than ten. But the defendant's objection in that regard is preserved.

There is also an objection to paragraph 34 dealing with sophisticated means. I think that that also should be overruled. The defendant used her skill as a physician to manipulate the medicine administered and also how things were charted. I think that's a sophisticated skill.

There is an objection to paragraph 35 regarding reckless risk of death or serious bodily injury, and I am overruling that objection. I am crediting testimony of Dr. Rothenberg on that issue.

Both parties have objected to paragraph 36 related to vulnerable victim enhancements. The defendant believes no enhancement should apply, and the government believes four levels should apply because of a large number of vulnerable

victims.   And I have already stated my reasons thinking there
were at least 75 patient victims, and in the opinion of the
Court, that's a large number, and so a four-level enhancement
would apply under 3A1.1(b)(2).

Paragraph 37 is objected to regarding abuse of
trust, position of trust and special skill.   I have already
described the special skill, and an oncologist certainly
holds a position of trust.   I think that enhancement applies,
and the objection is overruled.

On the obstruction of justice objection, I am
overruling that in part and granting it in part.   I believe
that it is appropriate based on the conviction for Count Four
of false statement under 18 U.S.C. Section 1001, and
two-level enhancement applies.   I am granting the objection
to the extent that it is based on perjury at trial.   In the
opinion of the Court, the fact that the jury credited
witnesses rather than Dr. Moon's testimony doesn't alone
amount to perjury, and that type of enhancement borders on
punishing a criminal defendant for exercising the right to
testify.   So I am not applying that enhancement based on
perjury, but I am applying that enhancement based on the
false statements to the investigators on January 9th, 2002,
regarding what medications were being administered and
related bills.

So the presentence report calculates an offense

level of 34.  Based on these rulings, the offense level would

be 36.  The defendant has no criminal history, has no prior

convictions, so she is in Criminal History Category I.

The advisory guideline calculations then would be

as follows.  First of all, it needs to be noted that the

statutory maximum sentence on any one count is ten years so

on Counts One, Two and Three there is a statutory maximum

sentence of ten years.  And on Count Four, it is five years.

Based on an offense level of 36 and a Criminal

History Category I, the revised guideline range would be 188

to 235 rather than 151 to 188 that's in the presentence

report.

The supervised release range would still be two to

three years.  Probation is not permissible under the advisory

guideline ranges.  Of course the guidelines are advisory.

The fine range would increase.  Under 5E at

offense level 36, it is $20,000 to $200,000.  There is a

hundred dollars per count special assessment for each count

of conviction, so that's a total of $400 that's mandatory;

the Court has no discretion.  And the Court finds that the

restitution amount is $432,238.

So there also is an objection to the

characterization of the offense conduct that starts at page

five of the report.  The objection essentially is that Dr.

Moon is contesting her conviction and intends to appeal and

doesn't concede the facts of the offense conduct. I am
granting that request to the extent that it is simply noted
for the record that she contests her conviction and is
appealing.

There is an objection to the victim impact issue,
and I have already ruled on that.

There was an objection to the obstruction of
justice section of the report, and I have ruled on that as it
relates to the enhancement.

There is an objection dealing with the recommended
special condition of a ban on working in the healthcare
industry if what is being recommended is a lifetime ban since
that's not the recommendation. The recommendation is the
prohibition on working in the healthcare industry during the
term of supervised release, then that objection really is
moot, and that's denied as moot.

There is an objection to what's characterized as
net monthly cash flow, and essentially there is an objection
to the recommended condition that a lump sum payment of
$271,000 be paid within 60 days of sentencing. I am granting
that recommendation to the limited extent. I think that that
lump sum payment needs to be made and shall be made when the
Crossville residence is sold because that's really what is
the heart of where that money would be coming from. And I
will spell that out in more detail shortly.

1          And counsel wanted to be heard on the voluntary

2    surrender issue.  But back on the cash flow issue, I am

3    granting that objection to the extent that it would require

4    $271,000 be paid within 60 days.

5          I think that takes care of all of the objections

6    other than the voluntary surrender issue that counsel wanted

7    to be heard on further.  Ms. Thompson, Dr. Moon has a right

8    to speak directly to the Court should she so choose.  If she

9    does not want to do so, that's also her right.

10          MS. THOMPSON:  Yes, Your Honor, she would like to

11   address the Court.

12          THE COURT:  All right.  Dr. Moon, if you'd come up

13   to the podium please, ma'am.

14          You can stand there at the podium if you'd like.

15   You don't need to be under oath.

16          THE DEFENDANT:  I not totally disagree with the

17   verdict I come out I received and convicted.  But I am, you

18   know, I respected their verdict, but I do not totally agree

19   because based on the under oath initial grand jury interview,

20   the nurses were confused because it was a lack of

21   understanding of medicine.  But I am truly respect, honor

22   Judge Campbell's fairness and, you know, try to understand

23   both side because this case was very complicated.

24          I fully responsible.  I managed my business poorly

25   because I was very, very busy, and I had a lack of support.

And I am not denying my responsibility at all.  I learned
very cost experience, but this will help my future to avoid
this mistake because I didn't supervise it carefully.  And I
was focused on patient care, truly only patient care, and I
didn't pay attention how this, you know, billing issues and
incorrect documentation and lack of supervisor role cause
this much trouble because practically every aspect of my
life, but also I gained spiritually incredibly.  So I lost
one thing, but I gained another part.

        I lost patient care which was my dream all my
life.  And I was very frugal.  I saved all the, you know,
hard work money.  I lost them all.  I lost -- I studied very
hard with language difficult.  At the present time I lost, I
surrendered my medical license and my practice.  And the last
one I didn't want to lose, but I lost my marriage life too.

        But this is a lesson I have to learn, so I willing
to go for it whatever given, you know, the sentence.  I
respect and I appreciate it, and I am looking for the purpose
of why this happened to me.

        And one thing I want them to know about the
medical condition is not simple.  Particularly dying patient
is not easy because you -- what my goal was, they want to
prolong their life, and I want maintain the quality of life.
I don't know how they perceived, but I did, and I did very
brief time I was grateful I was able to save a lot of lives

and my patients' lives, saved a lot of patients' lives.

For instance, Jack Simpson was good patient. He was a very cheerful, nice patient. I agree with the family. But when Universal Insurance Company announced bankruptcy and they didn't pay, I continued treating him. I had a second opinion. They said patient has very aggressive disease spread bone and liver and put in hospice care. I continued with my own money provided 5FU infusion, but he left, so a lot of cases.

And then Delores DeWitt, she had surgical complication and wound didn't heal and ruptured intestine. And then she her cause of death was surgical complication, not chemotherapy.

But I know they are upset. They are angry. But there is a lot of misunderstandings, and I wasn't really bad doctor. And I did my best I could, but I didn't manage it well. And I am willing, ready and gladly learn my lesson, and I respect judge's decision.

THE COURT: Thank you, ma'am. You can be seated. I will hear from the government, and then, Ms. Thompson, you can summarize your position, if you want to go ahead and summarize it now.

MS. THOMPSON: I was going talk about release.

THE COURT: Okay. Go ahead.

MS. THOMPSON: Your Honor, I would just ask that

1  she please be allowed to self report.  Up until now, she has

2  made absolutely every court hearing.  She is here today.

3  Knows that she could go into custody full well today.  She

4  still appeared.

5        When she received the indictment that she was

6  charged under, the other indictment had been dismissed.  When

7  she received notice of this indictment, she was in Korea.

8  She voluntarily came back from Korea to be here.  It makes a

9  difference, Your Honor, to Dr. Moon at this point whether she

10  voluntarily surrenders at the place of incarceration or she

11  is taken into marshal's custody.  It does have an effect on

12  her prison life, on her sentence calculation and on her

13  treatment.  And Your Honor, at this point that is what she is

14  looking -- I mean that is going to be the most important

15  things to her.  And so we would ask that she please be

16  allowed to self report to wherever she is going to be

17  incarcerated.

18        And certainly the government has her passport.

19  There is no danger of anything else.  So I would ask that she

20  be allowed to self report.

21        I also have this is receipt showing that she has

22  paid her special assessment fee, and like to make that part

23  of the record, Your Honor, as an exhibit.

24        THE COURT:  Okay.  You can hand it to the court

25  clerk.

1        MS. THOMPSON: It will have affect also on her

2  classification information. She would like to go to Fort

3  Worth to the appropriate placement in Fort Worth I forgot --

4  Carswell. So that's where she would like to be incarcerated

5  if possible.

6        I'd like to be heard about sentencing.

7        THE COURT: I will let Mr. Williamson go first

8  since he has the burden.

9        MR. WILLIAMSON: Thank you, Your Honor. I guess

10  first of all I will talk quickly about voluntary surrender

11  and release. The same reasons that the government requested

12  detention after trial will request now. The burden is on the

13  defendant in the circumstance pursuant to 18 U.S.C. 3143(a)

14  to prove that she is by clear and convincing evidence that

15  she is not a risk of flight. As we moved after trial simply

16  taking away her passport in no way removes the possibility of

17  flight from this country. Defendant obviously has strong

18  ties in other nations, other countries. She is, I assume,

19  about to be sentenced to some significant term of years

20  regardless of whether guideline sentence or not which would

21  give hear strong incentive to flee, so the government moves

22  that she should be detained after the sentencing procedure.

23        With respect to the sentence itself, Your Honor,

24  the defendant's recent -- the defendant's comment she just

25  made up here to the Court was a remarkable comment. It is a

complete absence of responsibility or remorse for what took

place and what this Court heard over two and a half weeks

during this trial in December took place in her offices where

she repeatedly for a two-and-a-half-year-period ordered her

nurses to give partial doses of Procrit to her patients.  And

the Court heard Dr. Rothenberg testify during that trial that

Procrit works in proportion to how much it is given.  So by

giving partial doses of Procrit to patients, the defendant

was specifically ordering her nurses to limit the red blood

cell-increasing properties of Procrit that her patients would

otherwise receive.

This was not a billing error.  This was not a

failure to supervise her nurses properly.  As this Court

heard day after day during the trial, this was the

defendant's intentional, willful conduct to deny 69 of her

patients of the appropriate chemotherapy side effect reducing

effect of Procrit.

Moreover, with respect to Taxol and Camptosar,

again this Court heard the testimony during the trial that

the defendant gave barely 50 percent of the Taxol that she

claimed to have given her patients.  She gave barely

two-thirds of the Camptosar she claimed to have given her

patients.

As a result, there are many families like the

DeWitts, like the Simpsons, like the Smiths who will never

know whether or not their loved ones received the appropriate
doses and if they had what would have happened to their loved
ones' life expectancy had they received that appropriate
medication.

And as the Court heard again repeatedly during
that trial, Dr. Moon mixed all of that medication and Dr.
Moon ordered all of that medication. That was not a billing
error. This was not a failure to supervise. This was not
the nurses' fault. This was Dr. Moon's fault. And the
jurors' verdict resoundingly rejects everything that Dr. Moon
said when she stood up here. And the fact that even after
the jury verdict and at this important sentencing hearing the
defendant fails to recognize that this was her own
intentional conduct that caused this verdict is, frankly,
shocking that at this juncture of this proceeding that's what
her response would be. And I think it actually goes very
directly to the factors contained in 18 U.S.C. 3553(a) which
inform the Court on how to sentence the defendant and the
government would submit where in the guidelines range the
defendant should be sentenced.

The nature -- A1 is the nature and circumstances
of the offense and the history and characteristics of the
defendant. As the Court is well aware, the nature and
circumstances of this offense are about as serious as they
possibly could be. It involves an oncologist entrusted with

1  the life-threatening care of her patients, willfully denying

2  those patients the care that she claims she was giving them.

3  The care she claimed she was giving them was the care that is

4  the highest standard of care, as Dr. Rothenberg testified.

5  So she was willfully giving them something else and not

6  talking to them about it.

7         Now, as Dr. Rothenberg testified, there are

8  circumstances under which different doses can be given but

9  only with full consultation with the patient.  This was Dr.

10 Moon making a decision on the patient's behalf for a lower

11 dosage without ever informing the patient that was what was

12 going to happen.  Moreover, as a number of witnesses pointed

13 out today, doing it not because she felt the patient would

14 get a better result because of that, but instead out of some

15 apparent sense of greed in that she continued to bill for the

16 full amount and administer a far lower amount.

17         So the nature and circumstances of the offense are

18 within the context of fraud offenses, the government would

19 posit are about as serious a fraud offense as you can

20 possibly create.

21         And the need for sentence imposed, which is A2, to

22 reflect the seriousness of the offense which is obviously

23 strong, but also to afford adequate deterrence to criminal

24 conduct and to protect public from further crimes of the

25 defendant, the defendant's failure to recognize the gravity

1   of her own conduct and the fact that this own conduct stems

2   from and was conducted entirely by herself, not by her

3   billing staff and not by her nursing staff, shows the need,

4   Your Honor, for a strong sentence.

5            So the government would submit a guideline

6   sentence is appropriate in this case and that within the

7   guideline range, the sentence should be at the upper end of

8   the guideline range to reflect the incredible seriousness of

9   the defendant's conduct in this case.

10           THE COURT:  Thank you.  Ms. Thompson.

11           MS. THOMPSON:  Yes, Your Honor.  The guidelines

12  are only one of the statutory considerations that the Court

13  takes into -- that the Court considers when deciding a

14  person's sentence.  The Court can also give downward

15  departures for different reasons, upward departures.

16           Your Honor, we would ask that in this matter,

17  there are twenty -- approximately 24 letters from different

18  patients that have been made part of the record that adore

19  Dr. Moon, that were grateful to her for her care.  And I

20  would ask that the Court balance those with the testimony the

21  Court has heard from other patients' families and in that

22  matter give her a sentence that is going to be not based so

23  much on emotion, that's going to be more based on the facts

24  and the consideration at trial.

25           Your Honor, the time and place for a personal

1  injury suit, for a tort matter is civil court. It is not
2  criminal court. And I would ask that based on that the Court
3  consider that carefully and please give Dr. Moon reasonable
4  sentence, a sentence that shows mercy and justice.

5  THE COURT: Let me make sure I understand what you
6  are asking me to do so the record is clear. Are you asking
7  for a sentence below the advisory guideline range under
8  Booker, and are you also moving for a downward departure, or
9  are you simply asking me to balance all of those things? It
10 is important for appellate review. I just want to make sure
11 I understand what you are asking for.

12 MS. THOMPSON: I think that I am asking for a
13 sentence -- obviously there is a statutory maximum in this
14 matter which does not fit with the guidelines. I am not
15 asking for a departure, but what I am asking is that the
16 Court balance as mitigation in considering or maybe just
17 towards the weight. What I am asking is that the Court put
18 towards the weight of the evidence the Court has heard in
19 forms of letters and testimony from patients, balance that
20 with the weight of the letters that we have provided from
21 other patients in terms of determining what is appropriate
22 there.

23 THE COURT: I read every letter as they came in
24 from both sides of the lawsuit, so I am aware of what you are
25 referring to.

1          MS. THOMPSON:  Okay.

2          THE COURT:  Anything else anybody wants to say

3 about anything else?

4          MR. WILLIAMSON:  Not from us, Your Honor.

5          MS. THOMPSON:  After the Court announces the

6 sentence, I do have some other items I'd like to address in

7 terms of appeal counsel, things likes that.

8          THE COURT:  All right.  Dr. Moon, if you'd come up

9 to the podium with counsel, I will impose sentence.

10         Dr. Moon, it is the judgment of the Court that the

11 following sentence be imposed.  You are hereby committed to

12 the custody of the United States Bureau of Prisons to be

13 imprisoned for a total term of 188 months.  It is broken down

14 as follows.

15         I am sentencing you to 120 months on Count One and

16 68 months on Count Two.  The 68 months is consecutive to

17 Count One for the total 188 months sentence.

18         On Count Three, I am sentencing you to 120 months

19 which is concurrent with the other counts.

20         And on Count Four, 60 months concurrent with all

21 the other counts.

22         I will recommend to the Bureau of Prisons that you

23 be incarcerated near Fort Worth, Texas if it is consistent

24 with your security classification.

25         In terms of supervised release, I am going to

order a two-year period of supervised release with the following special conditions.

First is that you have to pay $432,238 in restitution.  Restitution is due immediately, but at a minimum you have to make a restitution lump sum payment of $271,000 upon the sale of the property on Channing Lane in Crossville.

While you are incarcerated, restitution has to be paid through the Bureau of Prisons inmate financial responsibility program.  And should there be an unpaid balance when supervision commences, you have to pay at least ten percent of your gross monthly income towards restitution.

No interest will accrue, and you have to notify the Court of any significant changes in your economic circumstances that affect ability to pay.

I am waiving the drug testing requirements since there is no evidence that you have illegally used controlled substances.

You are prohibited from owning, carrying or possessing a firearm.

You have to furnish all financial records requested by the probation officer until all the restitution is paid.  You cannot incur any new debts or open additional lines of credit until all of the restitution is paid.

You are barred from engaging in any occupation,

business or profession in the healthcare industry while you
are on supervised release.

You have to cooperate with DNA collection, and you
cannot travel outside the United States absent prior consent
of the probation office.  That's not in the recommended
conditions, but I think it is appropriate, and I imposed it
earlier for post-conviction supervision.

In terms of standard conditions of the Court on
supervised release, they also apply.  You cannot commit
another federal, state or local crime.

You can't leave the district without permission.

You have to report as directed.

You have to be truthful to the probation officer.

You have to meet your family responsibilities.

You have to work regularly at a lawful occupation
unless excused.

You have to notify the probation officer at least
ten days prior to any change of residence or employment.

You cannot excessively use alcohol or use any
controlled substances that are illegal.  You cannot frequent
places where controlled substances are illegally sold or
used.

You cannot associate with persons engaged in
criminal activity.

You have to permit the probation officer to visit

you and confiscate any contraband that's in plain view.

You have to notify the probation officer within 72 hours of being arrested or questioned by law enforcement, and you cannot enter into an agreement to act as an informer without Court consent.

And you have to notify third parties of risks that may be occasioned by your criminal record, particularly as it relates to employment.

I am waiving the drug testing requirement.

And you cannot possess a firearm, and you have to notify the U.S. Attorney's Office within 30 days of any change of name or residence until all monetary sanctions are paid.

In terms of fines, the $400 special assessment is imposed. The record reflects you have already paid it. I am required to impose it.

In terms of additional monetary fines, in my opinion when you balance the large amount of restitution owed, $432,000, the fact that you will be getting a long sentence, over 15 and a half years, that most of your assets are held jointly with your husband or others and the fact that you can't practice medicine, you effectively don't have an ability to pay any further fine, and I think it is more important that the restitution be paid expeditiously. So I am not imposing a fine other than of course the restitution

amount you owe.

In terms of restitution, it was a condition of supervised release, but to make sure that there is no ambiguity about it, it is also a condition of your sentence. So the $432,238 in restitution is part of the judgment in the case.

I have considered the advisory guidelines. I have considered all of the evidence presented. I have considered the factors in 18 U.S.C. Section 3553(a) and everything that has been presented to the Court and have sentenced you within the advisory guideline range because in my opinion it is reasonable in this case.

I have sentenced you to the 188 months because of essentially two key reasons. The first is the advisory guideline range exceeds the statutory maximum for any one count, and I have imposed concurrent sentencing. And in addition, you have no prior conviction. And in my opinion, all things else being equal, the top of the range is more suitable for repeat offenders, and you are not a repeat offender.

You have a right to appeal.

THE DEFENDANT: I may not appeal, Judge, because I do not have financial condition to appeal so --

THE COURT: Well, let me tell you what your rights are in that regard. You have a right to appeal both your

conviction, and you have a right to appeal this sentence. You need to file a notice of appeal within ten days. If you direct your attorneys to file a notice of appeal, they will file a notice of appeal. If you ask the Clerk of Court to file a notice of appeal, he will file a notice of appeal on your behalf.

If you are unable to pay the cost of an appeal, you can apply to appeal as a pauper. And if you qualify, then you can appeal as a pauper. And what you will need to do in that regard is, Ms. Thompson, she will need to file an affidavit that would reflect her status of unable to pay the cost of an appeal.

But if you want to appeal, go ahead and file that appeal and file your affidavit as to what your financial status is. And if it is appropriate, then you will be granted leave to appeal as a pauper.

Let me make sure based on your response I want to make sure I cover this very clearly. You can appeal your conviction. You can appeal your sentence. And you must file a notice of appeal within ten days from today when judgment is entered. If you are unable to pay the cost of appeal, you can apply to appeal as a pauper. And if you so request, the Clerk of Court will prepare and file a notice of appeal on your behalf.

So don't be deterred by financial circumstances.

1    If you feel like you have grounds for appeal, then you should

2    appeal.  Of course that's a decision you and your lawyers

3    need to make, and I am not encouraging you to do one or the

4    other other than to very directly tell you what your rights

5    are.

6          Ms. Thompson, you said you wanted to raise some

7    other things.

8          MS. THOMPSON:  Yes, Your Honor, for the record, I

9    was not retained for the appeal.  So I wanted to know if

10    either I could withdraw -- she had asked that I request

11    counsel for her, appointed counsel.  You said we need to do

12    that by an affidavit.

13          THE COURT:  Well, my understanding of Sixth

14    Circuit procedure is that trial counsel or counsel at

15    sentencing, the last lawyer standing, so to speak, has to

16    move to be relieved in the Court of Appeals.  That there is a

17    presumption that you would continue to represent Ms. Moon.

18          If you are telling me the two of you have a

19    conflict and she does not want you to represent her, that's a

20    slightly different situation.  But if she qualifies for

21    appointment of counsel, certainly CJA counsel will be

22    appointed, and it would appear to me logical that you be

23    appointed unless the two of you have some kind of conflict.

24    You are now very familiar with the case.

25          Do you have a request in that regard?

1          MS. THOMPSON: No, Your Honor, I don't have a

2  conflict.

3          THE COURT: Okay. Of course the threshold

4  question is her IFP status, and I need her to file an

5  appropriate affidavit.

6          Ms. Moon, do you have any objection to Ms.

7  Thompson continuing to represent you on appeal?

8          THE DEFENDANT: Is it court-appointed?

9          THE COURT: Well, my question is based on in the

10  event you qualify for court-appointed counsel, do you want

11  Ms. Thompson to be that lawyer?

12          THE DEFENDANT: Oh, yes. She knows my case.

13          THE COURT: Okay. All right. Then the only thing

14  you need to do is file that statement, and I will evaluate

15  it. I am uncomfortable making that judgment without a sworn

16  financial affidavit.

17          Is there something else you wanted to raise?

18          MS. THOMPSON: No, Your Honor.

19          THE COURT: I need to make a decision about

20  surrender, but is there anything else, Mr. Williamson, I may

21  have overlooked?

22          MR. WILLIAMSON: Not to my knowledge, Your Honor.

23          THE COURT: I think this is a difficult issue. On

24  one hand Dr. Moon has been here every time she has been asked

25  to be here.

On the other hand, she has other countries she has
lived in and can go to, and there is she is facing a long
sentence, and that always raises issues of flight.  There has
been some dispute about whether there was a previous
violation of conditions of release.

The standard is set out in 18 U.S.C. 4133, and it
generally provides that a defendant sentenced to imprisonment
shall be detained immediately unless the Court finds by clear
and convincing evidence that the defendant is not likely to
flee or pose a danger to the safety of any person or the
community.

I think in light of the lengthy sentence and
ability to live elsewhere, I am going to detain Dr. Moon
because I think that the standard has not been met by clear
and convincing evidence that Dr. Moon will be remanded to the
custody of the marshal rather than self surrendering.

Is there anything else that we need to talk
about?

MR. SIMMONS:  Your Honor, since she has been
remanded to custody, there is an issue as to her indigency,
will she go then to the custody of the marshal and she is
going to be in the pipeline, would it be possible to set that
matter for a hearing before this court perhaps in the morning
as to her status as to indigency before she gets out of the
jurisdiction?  We'll have to fill out the financial

affidavit, have the Court make a determination quickly as to her status.

THE COURT:  Well, let's do this.  If Dr. Moon is willing to testify under oath right here and right now that she doesn't have the financial ability to employ counsel and then we'll supplement that representation with a sworn affidavit, then I will consider that having been satisfied.

MR. SIMMONS:  Okay.

THE COURT:  Are you willing to do that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  I need to tell you that it is a federal crime to misrepresent things to the Court.  You need to be aware of that.  Raise your right hand, please, ma'am.  Mrs. Bush will swear you in.

(Defendant sworn.)

THE COURT:  Dr. Moon, do you have the ability to employ counsel financially to represent you on appeal?

THE DEFENDANT:  At the present time until my house is sold.

THE COURT:  Is the answer no or yes?

THE DEFENDANT:  Well, conditional because I have to sell my house.  And my house is sold, then possibly.  The house is not sold, I have to wait.

MS. THOMPSON:  Could I say something --

THE COURT:  Yes.

1    MS. THOMPSON: -- on her behalf. First of all,
2  she is involved in a divorce currently, and all her real
3  property is held as joint property. So first of all, she
4  doesn't know what percentage of that real property is going
5  to be hers to do with as she chooses. That's up to the
6  divorce court.

7         Next, today the government has served upon her a
8  False Claims Act which I am sure will carry some serious
9  financial penalties. And the Court has made part of its
10 judgment this claim on this house in Crossville. So, Your
11 Honor, I think based on the fact that that's going to be a
12 lien on the house, the fact that she has this false claim and
13 that she doesn't have clear title to any of this property is
14 interfering with her real ability to hire counsel. Of course
15 the appeal has strict timeline on it.

16        THE COURT: Here is how I am going to resolve it.
17 Based on at a minimum she does not currently have the
18 resources in the next ten days to hire counsel that Ms.
19 Thompson you will be appointed as counsel under the CJA. If
20 her financial circumstances change, you have a duty and she
21 has a duty to inform the Court, and that could affect your
22 continued representation. But I think it is important at
23 this stage that if she wants to appeal that that appeal get
24 filed. That's a very important thing. And I want to give
25 her the opportunity to do that as I would every criminal

1  defendant.   And of course if this Court has made any errors,

2  the Court of Appeals should correct them.   That's how the

3  system works.

4             Anything else that we need to take up?

5             MR. SIMMONS:   No, Your Honor.

6             THE COURT:   All right.   Mr. Fielder, you may take

7  Ms. Moon into custody.   Thank you.

1              REPORTER'S CERTIFICATE

2

3          I, Cathy B. Leigh, Official Court Reporter for the

4   United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7   proceedings held in open court on April 24, 2006, in the

8   matter of UNITED STATES OF AMERICA vs. YOUNG MOON, Case No.

9   2:05-00003; that said proceedings in connection with the

10  hearing were reduced to typewritten form by me; and that the

11  foregoing transcript (pages 1 through 139) is a true and

12  accurate record of said proceedings.

13          This the 29th day of June, 2006.

14

15                          /s/ Cathy B. Leigh
                            Cathy B. Leigh, RDR, CRR
16                          Official Court Reporter

17

18

19

20

21

22

23

24

25